R. D. and Ida M. Cravens, Husband and Wife, Petitioners, *v.* Commissioner of Internal Revenue, Respondent.

Docket No. 66842. Filed July 10, 1958.

*Josiah G. Holland, Esq., John Fleming Kelly, Esq.,* and *S. Gordon Shreffler, Esq.,* for the petitioners.

*Carswell H. Cobb, Esq.,* for the respondent.

FISHER, *Judge:* Respondent determined a deficiency of $38,995.04 in petitioners' income tax for the year 1953.

The principal issue before the Court is whether the amount of $50,000, which was given to Superior Feed Mills in December 1953, was an ordinary and necessary business expense deductible in full in that year.

Ida Cravens is the wife of R. D. Cravens and is also a petitioner because they filed joint tax returns. She was not active in the business operations of R. D. Cravens.

### FINDINGS OF FACT.

Some of the facts have been stipulated and are incorporated herein by this reference.

Petitioners are husband and wife who reside in Oklahoma City, Oklahoma. They filed a joint income tax return with the district director of internal revenue at Oklahoma City for the year in question.

R. D. Cravens (hereinafter referred to as Cravens or petitioner) owned and operated a ranch known as the R. D. Cravens Ranch, near Oklahoma City, on which he raised livestock, particularly registered Hereford cattle.

It has been stipulated that petitioner kept his books and reported his income on a cash receipts and disbursements basis, with the one exception that raised cattle were carried in inventory.

The number of head of registered Hereford cattle held on the ranch at the end of the years 1946 through 1953 was as follows:

| Year ended Dec. 31 | Number of animals |
| --- | --- |
| 1946 | 148 |
| 1947 | 162 |
| 1948 | 204 |
| 1949 | 367 |
| 1950 | 305 |
| 1951 | 394 |
| 1952 | 568 |
| 1953 | 730 |

The method of operation generally employed by Cravens was to purchase feed, such as hay, grain, and concentrates, in large quantities in advance of his then present needs. Prepared, mixed feeds were usually ordered every week.

Cravens was unable to grow hay on his ranch in 1952 or 1953 due to a general drought condition during those years.

Petitioner fed his cattle mixed feeds which contained molasses. Such feeds could not be stored for any length of time as the molasses would cake and dry up. Therefore, mixed feeds were usually ordered weekly.

For several years prior to 1953, the ranch had purchased all of its mixed, prepared feed requirements from Superior Feed Mills (hereinafter referred to as Superior). Petitioner's purchases from Superior had been substantial. In 1952 the feed expense was $61,895.24, of which $30,893.81 represented purchases from Superior. In 1953, in addition to the expenditure of $50,000 at issue, petitioner's feed expense totaled $74,496.24, of which $38,196.23 represented amounts of feed purchased from Superior.

Petitioner was an exceptional customer of Superior's in that they sold feed directly to him. Their general practice was to sell to feed dealers. Petitioner maintained a 30-day open account with Superior and paid his bills normally on the 10th of each month.

A general drought condition existed in Oklahoma in 1953. This condition began in 1952 and extended into 1956. The cattle on petitioner's ranch were fed hay on October 15, 1953, which was 15 days ahead of the normal hay-feeding season.

In December 1953, Cravens considered selling his herd because of the drought conditions which existed. Cravens decided to keep his herd if he could be assured of obtaining his next year's feed requirements. He consulted his foreman who prepared a feed estimate which would carry the herd through January or February 1955. He also consulted his accountant as to the tax consequences of his proposed decision.

On or about December 22, 1953, Cravens telephoned B. D. Eddie (hereinafter referred to as Eddie), the president and general manager of Superior. Cravens wanted to know if Eddie could guarantee his next year's feed requirements. Eddie stated that due to the general drought condition he could not make any such guarantee. Cravens offered to buy the feed he needed but Eddie told him that he could not sell at a fixed price due to the possibility of extensive market fluctuations. Cravens then offered to send a check to Eddie for $50,000, and stated, in effect, that he wanted to know that he was going to have feed when and as he needed it. Eddie felt that he (Eddie) could not get hurt under the circumstances because he was not committing himself to any definite price. The only commitment he was making was to give Cravens preferential treatment in the light of the fact that he would have Cravens's money. At the end of the telephone conversation, Cravens said he would call Eddie back on it.

Later that day Cravens spoke with Eddie again on the telephone and gave him a list of his feed requirements, which list had been prepared by the foreman.

On the same day, Eddie mailed a letter and a form contract to Cravens. The form contract listed quantity and type of feed, and contained the statement "Terms per letter dated 12/22/53." The accompanying letter stated, *inter alia:*

Agreeable with our telephone conversation today we have entered a booking for you as per the enclosed contract #1472.

Prices will be those in effect on the date of shipment and you may have the privilege of varying the quantities from one item to the other to any reasonable extent. This contract however, will insure you your requirements when and as you need them.

In line with our telephone conversation we shall be happy to receive from you your check in the amount of $50,000.00 to apply.

Please sign the original copy of the confirmation enclosed herewith and return it to us together with your check in the amount of $50,000.00 in the self-addressed, postpaid envelope, retaining the duplicate for your files. * * *

No specific time for shipments was mentioned in the oral conversations or in the contract. Nor was there any definite price mentioned. The price was to be determined as of the date of delivery. Cravens could vary the quantities from one item to another "to any reasonable extent."

If the price of the feed which Cravens might order under this contract were less than the $50,000 given Eddie, Cravens would have been entitled to a refund.

On or about December 29, 1953, Cravens mailed to Superior the original copy of the confirmation, signed by him, together with a check payable to Superior in the amount of $50,000. The check was dated December 29, 1953, and was drawn on petitioner's account at the First National Bank & Trust Company of Oklahoma City. The check cleared said bank and the amount was charged against petitioner's account prior to the close of business on December 31, 1953.

There were no requests or orders given by Cravens to Superior for feed to be delivered in 1953.

On his 1953 income tax return, Cravens deducted the $50,000 payment as an ordinary and necessary business expense.

Superior kept its books on an accrual method. This $50,000 payment was entered as a credit to the R. D. Cravens's ranch account in Superior's general ledger. The cost of each subsequent delivery was entered by Superior on its books as a debit to the general ledger account of the ranch.

In 1954 deliveries under the agreements of December 22, 1953, totaled approximately $37,000. On November 22 and 23, 1954, Cravens disposed of approximately 514 head of cattle in a dispersal sale.

The dispersal sale had the effect of reducing the amount of feed delivered under the contract with Superior.

After the dispersal sale, Cravens continued to hold some cattle on the ranch. The amount of feed ordered under the contract was finally extinguished by deliveries extending into sometime in 1956.

The payment by Cravens to Eddie of $50,000 in 1953 was a deposit intended to be applied against any future orders Cravens might make. The amount given as a deposit was not used to purchase feed in 1953 and was not an ordinary and necessary business expense deductible in that year.

OPINION.

The issue before the Court is whether the amount of $50,000, which was given to Superior to insure future deliveries of feed, was an allowable deduction in 1953 under the provisions of section 23 (a) (1) (A) of the Code of 1939.[1] The parties have stipulated that, for the purpose of this case, petitioner reported his income on a cash basis with one exception not material to our discussion.

In order that a deduction may be properly taken under section 23 (a) (1) (A), the expense must be "paid or incurred during the taxable year."

It has long been held that expenses are not incurred until a legal obligation to pay them has arisen. *Bauer Bros. Co.* v. *Commissioner*, 46 F. 2d 874 (C. A. 6, 1931), affirming 9 B. T. A. 392 (1927), certiorari denied 283 U. S. 850 (1931).

In *Bauer Bros. Co.*, *supra*, the court defined the term "incurred" under the predecessor of section 23 as follows (p. 875):

Our first concern is with the sense in which the term "incurred" is used in section 234. It seems not to be disputed here that expenses are incurred only when there is an agreement or a legal obligation to pay them within the taxable year. Indeed, that seems to be the view taken of the very language of this section by the Supreme Court of the United States in Lucas, Commissioner of Internal Revenue v. Ox Fibre Brush Co., 281 U. S. 115, 50 S. Ct. 273, 74 L. Ed. 733.

Applying the above logic to the instant case, the legal obligation to pay for the feed did not arise in 1953.

A careful analysis of the transaction between Cravens and Superior convinces us that the $50,000 given to Superior was a deposit rather than a payment on account of a purchase. Support for this view is found in Cravens's own testimony to the effect that he would be entitled to a refund if the price of the feed ultimately delivered amounted to less than the money advanced. Moreover, Cravens was under no legal obligation to require delivery of any definite amount of feed in 1953

---

[1] SEC. 23. DEDUCTIONS FROM GROSS INCOME.
In computing net income there shall be allowed as deductions:
(a) EXPENSES.—
(1) TRADE OR BUSINESS EXPENSES.—
(A) In General.—All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, * * *

or any other particular year and it is apparent that no 1953 deliveries were intended.

The significant obligation imposed upon Superior was to give Cravens preferential treatment. The testimony of Eddie at the trial in this matter clearly supports that view. Eddie stated:

I felt that I [Superior] couldn't get hurt under those circumstances because I was not committing myself to any definite price. The only commitment that I [Superior] was making is that I [Superior] was going to give preferential treatment and he [Cravens] was going to get feed ahead of anyone else if it got down to a serious situation like that in light of the fact that I had his money * * *

At the end of 1953, Cravens had an asset as the result of this contract, not a deductible expense. Any expense that would arise would come about upon delivery by Superior of feed which Cravens might order. Until the legal obligation to pay for the feed arose, which would occur only upon delivery on Cravens's demand, no deductible expense was incurred. *Bauer Bros. Co., supra.*

We now turn our attention to the question of whether any amount was "paid" to Superior in 1953 which would entitle Cravens to a deduction under section 23 (a) (1) (A). We think it is clear that the "payment" required as a basis for a deduction has not been accomplished where there is merely a deposit as security for payment. See *Arthur T. Galt,* 31 B. T. A. 930 (1934); *Field* v. *Blacklidge,* an unreported case (D. C. Ill., 1940; 27 A. F. T. R. 1073, 40–2 U. S. T. C. 9499). Since we have found that the money given to Superior by Cravens was a deposit, it follows that nothing was "paid" in 1953 which would result in an allowable deduction. See *Rose* v. *United States,* 256 F. 2d 223 (C. A. 3, 1958).

Upon the facts, it is our view that at the end of the year 1953 petitioner was, at most, a party to a contingent contract of sale in which the price, the time of delivery, and to some extent, at least, the type of merchandise to be purchased, remained to be determined. See 1 Williston, Sales secs. 1, 2 (1948); *Ogle* v. *Oklahoma City Horse & Mule Commission Co.,* 173 Okla. 34, 47 P. 2d 130 (1935); *Veenstra & DeHaan Coal Co.,* 11 T. C. 964 (1948).

Cases cited by petitioner on brief are distinguishable on their facts and are not controlling of this issue.

In the light of the views expressed above, it is unnecessary to discuss the alternative argument raised by respondent to the effect that even if the payment were an incurred expense in 1953 the deduction should not be allowed because to do so would materially distort petitioner's income for the year 1953.

The income tax returns filed by petitioner jointly with his wife for the years 1950, 1951, 1952, 1954, and 1955, which were attached to the stipulation and admitted over objection of the petitioners have in no way affected our conclusions.

*Decision will be entered under Rule 50.*