E. Keith Owens, Transferee, Petitioner *v.* Commissioner of Internal Revenue, Respondent

E. Keith Owens and Sharon E. Owens, Petitioners *v.* Commissioner of Internal Revenue, Respondent

Docket Nos. 1947–70, 1988–70.    Filed April 2, 1975.

*Frank G. Pollock* and *William L. Powers,* for the petitioners.
*James C. Lynch,* for the respondent.

Tannenwald, *Judge:* In these consolidated proceedings, respondent determined the following deficiencies in income tax:

| Petitioners | Docket No. | Year | Deficiency |
|---|---|---|---|
| E. Keith Owens (transferee) | 1947–70 | 1964 | $103,601.41 |
| E. Keith Owens and Sharon E. Owens | 1988–70 | 1965 | 78,443.00 |

In docket No. 1947–70, the issues are (1) whether petitioner E. Keith Owens is a transferee of Mid-Western Investment Corp. under section 6901 [1] so as to be liable for any deficiency deter-

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

mined in such corporation's 1964 corporate income tax and (2) whether the corporation is entitled to a deduction of $200,068.18 for feed purportedly purchased in 1964 but not used until 1965.[2] Respondent has conceded that to the extent that it is determined that the corporation's feed expense deduction was properly disallowed in 1964, a corresponding deduction should be allowed in 1965.

In docket No. 1988–70, the issue is whether the disposition by petitioner E. Keith Owens of all of his stock in Mid-Western Investment Corp. constituted a sale so as to entitle petitioners to long-term capital gain treatment on the $246,925 gain realized. This issue is interrelated with the transferee liability issue in docket No. 1947–70.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The stipulation of facts, together with the exhibits attached thereto, is incorporated herein by reference.

Petitioners E. Keith Owens and Sharon E. Owens, husband and wife, resided in the Detroit, Mich., area at the time of the filing of the petitions herein. For the taxable year 1965, they filed their joint Federal income tax return with the District Director of Internal Revenue, Detroit, Mich. Sharon E. Owens is a petitioner in docket No. 1988–70 only because a joint return was filed. E. Keith Owens will hereinafter be referred to as petitioner.

Mid-Western Investment Corp. (hereinafter referred to as Mid-Western) was a Michigan corporation incorporated on December 17, 1962. Petitioner was one of its incorporators. During the years in issue, until August 20, 1965, petitioner was an executive of Mid-Western and the owner of all of its stock (4,000 common shares). For the taxable years 1963, 1964, and 1965, Mid-Western reported taxable income of $24,288.16, $26,719.29, and $245,650.31, respectively.

Beginning in November 1963, Mid-Western undertook the underwriting of the sale of the common stock of Alexander Hamilton Life Insurance Co. of America (hereinafter referred to

---

[2] The corporation deducted $212,885, of which respondent has allowed $12,816.82. This amount, determined by a formula based on the cost of feed, feeding days, and number of feeding cattle, represents the amount of feed deemed consumed in 1964. Petitioner E. Keith Owens has conceded that respondent properly disallowed the corporation's $7,134.65 cattle trucking expense deduction for 1964 on the basis that such expense was a part of the acquisition costs of the cattle purchased.

as Alexander Hamilton), a Michigan corporation. Alexander Hamilton had been granted a preliminary charter by the State of Michigan in the latter part of October 1963 which permitted the funding of the corporation and, if successfully funded, would entitle the corporation to a final charter. Petitioner was an incorporator and chief executive officer of Alexander Hamilton.

During 1963 and 1964, Mid-Western sold Alexander Hamilton stock having a gross sale price of $693,000 and $8,728,000, respectively. Sales commissions totaling $103,950 and $1,205,250 for the respective years were credited by the National Bank of Detroit to Mid-Western's bank account and were reported by Mid-Western on its tax returns for the respective years.

Mid-Western concluded its underwriting activities in April 1964 and Alexander Hamilton received its permanent charter in May of the same year.

During early 1964, petitioner withdrew from Mid-Western most of the income earned from this underwriting and invested the majority of these funds in Alexander Hamilton stock.

Upon receipt of its permanent charter, Alexander Hamilton was authorized to sell life insurance and during its first year placed in force approximately $118 million of insurance. Petitioner, as chief executive officer, had the overall responsibility for directing the company's activities. These activities included matters pertaining to the issuance of stock, obtaining approval for insurance policies, hiring employees (including agents), supervising investments, and the general organization of the home office. As a result, petitioner was extremely busy managing Alexander Hamilton during its first year of existence.

During the fall of 1964, petitioner, upon the recommendation of one of Alexander Hamilton's general agents, went to the Detroit office of Lybrand, Ross Bros. & Montgomery (now Coopers & Lybrand and hereinafter referred to as Lybrand), an accounting firm, for the purpose of obtaining accounting, business investment, and tax-planning advice. This advice included matters relating to Mid-Western as well as to petitioner's personal financial situation. Petitioner met with Ralph J. Paonessa (hereinafter referred to as Paonessa), an attorney and certified public accountant then assigned to Lybrand's tax department, and they discussed various investments, including apartment houses, oil wells, and cattle. Petitioner expressed a particular interest in cattle investment.

Lybrand's New York and Detroit offices had clients who had dealt previously in cattle investments, including cattle feeding programs. A majority of these investments had been negotiated through Oppenheimer Industries, Inc., of Kansas City, Mo. (hereinafter referred to as Oppenheimer).

Oppenheimer managed breeding herds for absentee owners and represented absentee owners of feeding cattle (generically referred to as feeder cattle). Acting as a feeder cattle agent, Oppenheimer would enter into arrangements for acquiring cattle, develop the contractual arrangements for the operation of feeder cattle, prepare the contracts, analyze and project financial and tax aspects of the transactions, and arrange for the financing.

Jerome Halperin (hereinafter referred to as Halperin), a Lybrand tax partner, who was personally acquainted with a number of people involved in Oppenheimer's operations and who had previously recommended the company to other clients, was consulted by Paonessa and gave advice on Mid-Western's proposed cattle feeding operations.

Mid-Western engaged Oppenheimer to act as its agent for the purpose of entering into contracts for the purchase and maintenance of feeder cattle. Since petitioner had withdrawn Mid-Western's funds to invest in Alexander Hamilton stock, Mid-Western borrowed the money, collateralized by petitioner's Mid-Western stock, to invest in the cattle feeding business. On December 16, 18, 19, and 24 of 1964, Oppenheimer entered into four separate contracts on behalf of Mid-Western for the purchase and maintenance of cattle.

The feeder cattle contracts reflected the purchase of cattle through the use of a 5-percent deposit on the purchase price and a note for the remaining balance. Each note bore interest at $6\frac{1}{2}$ percent per annum. Three of the notes were payable by June 1965, the fourth was to be due December 16, 1965, and each provided for a prepayment of interest at the time of signing the contract. Except for certain differences in amounts and relevant time periods, all four contracts contained identical language and provisions. Each contract contained the following provisions relevant to the feeding operations:

This contract is between [the named feeder], whose address is ..........................., hereinafter called the "FEEDER," and Mid-Western Investment Corporation, whose address is 1808 Main Street, Kansas City, Missouri, hereinafter called the "OWNER." The OWNER shall be represented by OPPENHEIMER

INDUSTRIES, INCORPORATED, of 1808 Main Street, Kansas City, Missouri, as AGENT, for the purpose of entering into this contract with the FEEDER on his behalf, and for the purpose of supervising performance under the terms of this agreement and seeing it through to execution and final settlement.

THE FEEDER AND THE OWNER HEREBY DECLARE AND ACKNOWLEDGE THAT THE ONLY AGREEMENTS AND UNDERSTANDINGS EXISTING BETWEEN THEM, AS CONTRACTING PARTIES, ARE THOSE WHICH ARE SPECIFICALLY SET FORTH HEREINAFTER, THE SAME BEING THE FOLLOWING:

1. PURCHASE OF CATTLE. The FEEDER hereby agrees to sell to the OWNER, and the OWNER hereby agrees to purchase from the FEEDER, [the number of cattle purchased] head of [the type of cattle] now owned by, and in the possession of, the FEEDER. These cattle shall be delivered to the feed lot of [the named feeder] located at ......................., at the expense of the FEEDER. These cattle shall be of .................. grade or better quality, shall be merchantable at the time of the purchase contracted for herein, and they shall weigh between ........ and ......... pounds each. If horned at the time of purchase by the OWNER, the cattle shall be (dehorned) (tipped) at the expense of the FEEDER. The OWNER and the FEEDER understand and agree that if the FEEDER is unable to deliver, by the beginning date and in accordance with the terms of this agreement, the number of cattle specified above, this contract shall be adjusted on [date specified] to state the exact number of head actually purchased by the OWNER on the beginning date of this agreement.

* * *

3. METHOD OF FINANCING AND PAYMENT. The OWNER hereby agrees to pay to the FEEDER, within ten (10) days of the signing of this contract, a sum equal to five percent (5%) of the total purchase price, as specified elsewhere in this contract, and to execute a note and chattel mortgage in favor of the FEEDER for the balance remaining of the total purchase price. The note shall provide for the advance payment, within ten (10) days of the signing of this contract, of the sum of $.................. in interest, the same being ....... ....... days' interest computed at the rate of 6½% per annum on ninety-five percent (95%) of the total purchase price, as set forth elsewhere in this contract. Further, the note shall also provide for payment of the balance of the principal sum representing the purchase price out of the proceeds of the sale of the cattle, whenever sold. The OWNER and the FEEDER hereby agree that the OWNER shall not be liable on the note for payment beyond the proceeds of the sale of the cattle covered by the chattel mortgage securing said note. The FEEDER warrants that the chattel mortgage thus executed shall be a first lien on the cattle herein purchased.

4. RESPONSIBILITY FOR CARE AND MAINTENANCE. The FEEDER agrees to feed and care for the OWNER'S cattle in accordance with the standards of care and responsibility which he could be expected to show if the cattle were his own, and in accordance with the standards of care and responsibility generally accepted as good animal husbandry. The FEEDER agrees to pay all expenses connected with the feeding of said cattle, including any personal property taxes, inter-ranch or intra-ranch transportation, feed salt,

minerals, spray, any real estate rentals, labor, and any other expenses not specifically set forth in this contract as expenses which the OWNER agrees to pay. The contracting parties agree that the FEEDER is an independent contractor and not the agent or employee of the OWNER. The FEEDER hereby agrees to assume all responsibility for, and protect the OWNER from any loss occasioned by, any claim asserted for: (A) Social Security, Withholding, Unemployment Compensation, or any other taxes on or measured by wages paid to the FEEDER'S workers; (B) Workmen's Compensation claimed by any of the FEEDER'S workmen, employees or sub-contractors; (C) by third persons because of or growing out of any actions connected with the handling of OWNER'S cattle while in the FEEDER'S actual or constructive custody.

5. LENGTH OF FEEDING. The FEEDER agrees to feed, and otherwise responsibly care for, OWNER'S cattle for at least ....... days, unless sold with the OWNER'S permission before expiration of such length of time, and the FEEDER, for such period of feeding, guarantees an average weight gain of two (2) pounds per day.[3] After said minimum period, the FEEDER shall sell the cattle so as to take advantage of favorable market conditions, in groups as he sees fit, subject to concurrence of the OWNER'S agent specified herein. Should the cattle not be sold by ....................., 19......., the OWNER shall have the right on that date, or any date thereafter, to instruct the FEEDER to sell the cattle at the best price obtainable, and the FEEDER shall comply with such instructions within no longer than ten (10) days, during which period the FEEDER shall continue to feed and otherwise responsibly care for OWNER'S cattle so as to protect the OWNER from any loss occasioned by delay in selling. In no event shall the feeding and care of OWNER'S cattle, under the terms of this contract, continue beyond ....... days.

6. PAYMENT FOR FEED. OWNER agrees to purchase feed from the FEEDER AND FEEDER agrees to deliver to the OWNER at the commencement of this contract [a specified amount, see table, p. 8 *infra*] DOLLARS of feed per head; payment for this feed will be made on or before .................. 19...... The OWNER and the FEEDER understand and hereby agree that the OWNER will not be required to furnish any additional feed under this contract and if additional feed is required to maintain the cattle in the prescribed manner, that such feed will be furnished by the FEEDER.

7. BONUS OR PENALTY. At the termination of this contract, the total weight gain attained by the cattle during the feeding period shall be determined by subtracting the weight at the time of purchase by the OWNER from the weight at the time of sale by the OWNER, both weights being determined in accordance with the provisions of Paragraph 2 above. If the total weight gain multiplied by $............. per pound exceeds $............. × number of head at start of contract, the difference will be paid as a bonus to the FEEDER. If the total weight gain multiplied by $............. per pound is less than $............. × number of head at start of contract, the difference will be paid by the FEEDER to the OWNER as a penalty.

---

3 The relationship between this provision and the Bonus or Penalty provision (par. 7) is not readily discernible and is unexplained in the record. We note that this provision can be correlated with the standard printed bonus or penalty provision but the latter has been replaced by par. 7 in the form set forth in these findings.

8. DETERMINATION OF PROFIT OR LOSS. Profit, or loss, from the transactions covered by this contract shall be determined by deducting from the gross sale price received for the cattle the following listed expenses if paid by the OWNER:

    A. Purchase Price of Cattle

    B. Cost of Feeding (Including Cost of Feed)

    C. Interest

    D. Transportation Costs

    E. Order Buying Commissions

    F. All Fees, Commissions, and Costs Incidental to Cattle Sales

    G. Registration and Filing Fees

    H.

    I.

    J.

In consideration of the FEEDER agreeing to guarantee and insure the OWNER against a total net loss of more than Five and no/100 dollars ($5.00) per head the OWNER agrees that, in final settlement of this contract, the FEEDER shall receive 50% [4] of any net profit realized from this transaction, determined at the time of final settlement of all obligations under this contract. In understanding that if any net loss results to the OWNER after sale due to market decline, mortality, or any other cause whatsoever, the FEEDER guarantees that the loss will be limited to the amount stated above in this paragraph, it is also understood that the FEEDER will refund to the OWNER any and all sums in excess of the stated loss per head. In computing the net profit or loss, any item for which the OWNER expended cash in connection with this contract shall be included in the computation.

    * * *

10. VETERINARY SERVICES. The FEEDER agrees to pay all expenses of reasonable, customary, ordinary or necessary veterinary services, which the FEEDER agrees to provide for OWNER'S cattle during the term of this contract as responsible care requires.

    * * *

13. TERMINATION OF CONTRACT. This agreement shall terminate automatically, unless the OWNER by written notice elects otherwise, if or when the FEEDER dies, becomes bankrupt or insolvent, makes any assignment for the benefit of creditors, attempts to sell, mortgage, pledge, remove, dispose of or injure any cattle belonging to the OWNER, if any distress, execution or attachment is levied upon the cattle or any part thereof, or if any distress, execution or attachment is levied upon any premises, equipment or other asset belonging to the FEEDER which, in the judgment of the OWNER or the OWNER'S agent, will render continued performance under the terms of this contract impossible.

In addition, the OWNER shall have the right to terminate this agreement upon three (3) days written notice to the FEEDER if the FEEDER violates any provision of this contract or becomes involved in any financial difficulty which, in the opinion of the OWNER'S banking connection, may impair his financial responsibility.

---

4 The Taber Cattle Co. contract provided a 60-percent share for the feeder.

Upon termination of this contract under this clause, the FEEDER shall deliver forthwith the OWNER'S cattle in accordance with directions supplied by the OWNER or his agent; and the OWNER is hereby authorized to enter upon any premises where the cattle, or any part thereof, may be found, and take possession of and remove such cattle, and, in addition to possession of the cattle, the FEEDER guarantees to the OWNER the return of such feed as may have been unconsumed and in excess of the amount that could have reasonably been used till the date of termination.

The FEEDER hereby agrees, during the entire period covered by this contract, to keep the OWNER'S cattle where they may be seen and inspected by the OWNER or his agent, and the FEEDER agrees never to place OWNER'S cattle in circumstances or on premises to which the OWNER is, or may be, denied free access.

In the event that this contract is terminated in accordance with the terms and conditions of this section (Numbered item 13) and the FEEDER is unable to deliver the OWNER'S cattle in accordance with the directions supplied by the OWNER or his AGENT, the FEEDER hereby agrees that the alternative shall be immediate delivery to the OWNER of a cash sum equal to the reasonable market value [of] the cattle at the time delivery of same was directed, less the amount of the outstanding first mortgage for which the cattle were pledged as collateral, in addition to such other sums specified above as being immediately due the OWNER upon termination of this contract under this section (numbered item 13).

The table below shows the figures relevant to each of the contracts:

| Feeder | Price of feed per head | Payment date | Cattle purchased |
|---|---|---|---|
| Taber Cattle Co., Casa Grande, Ariz. ____ | $55 | Dec. 16, 1964 | 250 |
| Orleton Farms Co., London, O. _____ | 90 | Dec. 18, 1964 | 474 |
| Mutual Feed Co., Scottsbluff, Nebr. ____ | 107 | Dec. 24, 1964 | 800 |
| Kern County Land Co., Bakersfield, Calif. | 105 | Dec. 19, 1964 | 675 |

The feed cost was a figure negotiated between the parties for each separate contract. The two factors primarily influencing this cost were: (1) The availability of feed for that particular geographical area of the country and (2) the type and size of the animal. Pursuant to the four contracts, Mid-Western paid $212,885 in 1964 and deducted that amount on its 1964 corporate income tax return.

At the time the feeder cattle contracts were entered into, neither Owens nor his accountants had any knowledge of either a shortage or abundance of feed. At that time, one of the feeders, Mutual Feed Co., through its affiliate Cook Livestock Co., had on hand the feed required by its contract. Mid-Western expected to make a profit from the feeder cattle activity but to reduce its 1964 tax liability by deducting the prepaid expense for cattle feed

against its other profits. Between March 30, 1965, and July 12, 1965, the cattle owned by Mid-Western were sold. On the four contracts, Mid-Western realized a total net profit of $9,907.08, i.e., the amount received in excess of all sums paid out by Mid-Western. In the accountings between Oppenheimer and Mid-Western, the latter received credit for amounts representing unused feed with respect to two contracts and was charged additional amounts for excess feed in respect of the other two contracts.

By 1965, Lybrand had been appointed as Alexander Hamilton's certified public accountants and petitioner had frequent contact with Lybrand's representatives. In May 1965, Halperin had a discussion with one Tommy Thompson (hereinafter Thompson) about the fact that there were two men in Florida who had large net operating losses which they were interested in utilizing. As a result, Halperin and Paonessa spoke with Manuel Santeiro, a.k.a. Manolo Santeiro (hereinafter Santeiro), and Enrique Rousseau (hereinafter Rousseau)[5] about purchasing the stock of Mid-Western. However, because Halperin and Paonessa feared the possibility that the Internal Revenue Service would raise collapsible corporation issues, a sale of the stock was deferred until the cattle had been sold and the gain realized by Mid-Western. In the latter part of July or the early part of August 1965, Paonessa arranged a meeting in Palm Beach, Fla., at which time he and Halperin met with Rousseau, Santeiro, and Thompson, their accountant.[6] By this time, petitioner had decided to sell his Mid-Western stock, so long as an acceptable deal could be worked out. His stated reasons were: (1) His accountants recommended it and (2) he was so busy at Alexander Hamilton that he had no time to devote to any business operations by Mid-Western.

At the meeting in Palm Beach, two items were resolved: (1) The price of the stock and (2) an indemnification agreement which was to be incorporated into the contract. On August 20, 1965, petitioner entered into an agreement with Rousseau and Santeiro for the sale of his Mid-Western stock. Relevant parts of this agreement provide:

---

[5] Petitioner was not involved in these discussions and testified that he never met Santeiro or Rousseau.

[6] A lawyer representing Rousseau and Santeiro, one Bailey, may also have been at this meeting.

2. [Petitioner] agrees to sell said 4,000 shares of stock and [Rousseau and Santeiro] agree to buy the same for the sum of $262,842.26 cash, on the representation that the assets of MID-WESTERN INVESTMENT CORPORATION are represented to consist solely of the sum of $299,822.62 cash, and that there are no debts or claims, contingent or otherwise, now existing against said corporation.

3. [Petitioner] hereby agrees to hold [Rousseau and Santeiro], jointly and severally, harmless from any loss that may result to them or either of them as stockholders of MID-WESTERN INVESTMENT CORPORATION because of any tax, claim, action, or demand against MID-WESTERN INVESTMENT CORPORATION and to reimburse [Rousseau and Santeiro] for any expenses which they as stockholders or to which the corporation may be put in defending any claims against said corporation that exist now, contingent or otherwise, against said corporation or which may arise against said corporation as a result of the sale of this stock by [petitioner], and likewise, [petitioner] agrees to hold harmless [Rousseau and Santeiro], or either of them, from any transferee liability that may be asserted against [Rousseau and Santeiro], or either of them, as transferees of said stock by virtue of this sale and to reimburse them for any costs or expenses incurred by [Rousseau and Santeiro] in defending any such claims, actions or demands. Notwithstanding anything to the contrary contained in this paragraph 3, [petitioner] shall not be liable to [Rousseau and Santeiro], or either of them, for any tax, claim, action, or demand against MID-WESTERN INVESTMENT CORPORATION resulting on account of any act or omission of [Rousseau and Santeiro], or either of them, or their successor or successors, subsequent to the sale contemplated by this Agreement, or on account of any act or omission of any one or more of the members of the Board of Directors, or the officers of MID-WESTERN INVESTMENT CORPORATION, subsequent to the sale contemplated by this Agreement.
* * *

5. [Rousseau and Santeiro] understand that the said MID-WESTERN INVESTMENT CORPORATION (in this paragraph 5 called "MIC") has elected with the consent of its shareholder at the time of such election to be treated as a small business corporation under § 1372(a) of the Internal Revenue Code of 1954, as amended, and, jointly and severally, they agree that they will not do, permit to be done, or cause or permit MIC to do, either intentionally or unintentionally, any act or thing to cause the revocation or failure of such election for the calendar year 1965, and they, jointly and severally, agree to hold [petitioner] harmless and promptly to reimburse [petitioner] for any taxes which he shall be required by law to pay by reason of such revocation or failure of such election, any taxes which he shall be required to pay in such event over and above those taxes which he would have been required to pay had such election remained in full force and effect for the entire calendar year 1965.

The closing of the transaction occurred in New York City at the Bank of Nova Scotia, from which Rousseau and Santeiro borrowed the funds to purchase the stock. The only people at the closing were Paonessa, Rousseau, and Santeiro. Pursuant to the

closing, petitioner received $262,842.26 for his Mid-Western stock.

On August 20, 1965, a check for $299,822.62, drawn on Mid-Western's checking account, was paid by the National Bank of Detroit. The effect of this check was to reduce the balance in the account to zero.

Rousseau and Santeiro timely filed shareholder consents to continue Mid-Western's 1965 subchapter S election. On August 23, 1965, Mid-Western adopted a resolution of liquidation. A certificate of dissolution, signed on September 7, 1965, by Rousseau and Santeiro, was filed on December 23, 1965, with the Michigan Corporation and Securities Commission. On its 1965 tax return, Mid-Western reported taxable income of $245,650.31 and that this $245,650.31 was distributed to Rousseau in the amount of $140,020.68 and to Santeiro in the amount of $105,629.63.

On their 1965 joint return, petitioner and his wife reported the sale of Mid-Western stock as resulting in $246,925 of long-term capital gain.

On December 30, 1969, respondent issued a notice of deficiency to petitioner and his wife for 1965 which determined that Mid-Western's 1965 undistributed subchapter S income of $245,650.31 was taxable to them and made a corresponding adjustment in the amount reported as long-term capital gain on the stock sale.

On December 30, 1969, respondent also issued a notice of deficiency to petitioner as transferee of the assets of Mid-Western which determined that a $103,601.41 deficiency in Mid-Western's corporate income tax for the taxable year 1964 was due. In addition, separate notices of deficiency were issued to Rousseau and Santeiro as transferees of the assets of Mid-Western which determined that a $103,601.41 deficiency in Mid-Western's corporate income tax for the taxable year 1964 was due from each of them. Each of these notices stated that Mid-Western "has been dissolved and the assets were transferred to you on or about August 20, 1965."

### OPINION

The threshold issue is the determination whether the transaction between petitioner, on the one hand, and Santeiro and Rousseau, on the other, in August 1965 should be treated in

accordance with its purport as a bona fide sale or, contrariwise, should be viewed as merely a "paper cover" for what was essentially a distribution by Mid-Western of its cash to petitioner with a commission having been paid to Santeiro and Rousseau. If the former is the proper view to be taken, petitioner ceased to be a shareholder and correctly treated the transaction as giving rise to capital gain, with the result that Santeiro and Rousseau became taxable, as the shareholders of Mid-Western, on its undistributed subchapter S income for the taxable year 1965 and as transferees in respect of any deficiency in Mid-Western's income taxes for the taxable year 1964. On the other hand, if the "paper cover" view prevails, petitioner is the proper person to be taxed with respect to both segments of respondent's determination.

The resolution of this issue, under the peculiar circumstances of this case, involves a dual burden of proof. As to the taxable year 1965, the burden of proof is on the petitioner to show that the transaction constituted a bona fide sale so that he ceased to be a shareholder of Mid-Western. *Welch v. Helvering,* 290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. As to the taxable year 1964, resolution of the issue is critical to the determination that petitioner was a transferee of the assets of Mid-Western; in this frame of reference, respondent has the burden of proof. Sec. 6902(a). Thus, it is possible to hold against each party—petitioner as to 1965 and respondent as to 1964.

Certain facts have been satisfactorily established. It is clear that at the time of the transaction: (1) Mid-Western's sole asset was $299,822.62 in cash and it had no disclosed liabilities; (2) Santeiro and Rousseau borrowed the money from the Bank of Nova Scotia to make the payment to petitioner; (3) on August 20, 1965, the contract between petitioner, on the one hand, and Santeiro and Rousseau, on the other hand, was executed; (4) on the same day, the $299,822.62 was withdrawn from Mid-Western's bank account and apparently [7] the contract was closed; (5) the closing took place at the office of the lending institution (the Bank of Nova Scotia) in New York City; (6) Santeiro and Rousseau made no use of Mid-Western after the closing, having

---

[7] If the transaction had not been closed on Aug. 20, petitioner would presumably have received the money from Mid-Western in his capacity as shareholder, since it is inconceivable that he would have permitted Santeiro and Rousseau to receive such money prior to the transfer of the stock to them and petitioner would not have made such a transfer except against payment.

resolved on August 23, 1965 (3 days later), to dissolve Mid-Western and having completed the dissolution by the end of the year; (7) Santeiro and Rousseau were receptive to engaging in the transaction because of losses which they believed they could apply against any of the undistributed subchapter S income of Mid-Western; (8) petitioner, irrespective of any other considerations, had significant tax motives for engaging in the transaction; and (9) the provisions of the agreement between petitioner and Santeiro and Rousseau were constructed so as to require the undertaking by the latter to continue the subchapter S status of Mid-Western, a consideration normally of no significance to the sellers of the stock.[8]

In certain other respects, which to our mind are important, there are gaps in the evidence which cause the record herein to be inconclusive. (Why these gaps exist is best known to the parties.) Among the inconclusive elements are the following:

(1) Santeiro and Rousseau were represented, during the negotiations and consummation of the August 20, 1965, transaction, by an accountant and a lawyer. While petitioner contends that the latter were independent professional advisers, we are not so easily swayed. Neither Rousseau nor Santeiro nor their professional representatives were called as witnesses at the trial. That Paonessa and Halperin may have testified that these advisers were independent and adverse to them clearly is testimony from interested witnesses which we are not required to accept at face value. E.g., *Braunstein v. Commissioner*, 305 F. 2d 949, 952 (2d Cir. 1962), affg. 36 T.C. 22 (1961), affd. on other grounds 374 U.S. 65 (1963); *Seletos v. Commissioner*, 254 F. 2d 794, 797 (8th Cir. 1958), affg. T.C. Memo. 1956–283.

(2) None of the records relevant to the loan from the Bank of Nova Scotia have been presented to the Court. We have not been made aware of the term of, nor the collateral for, this loan, when it was made or repaid, nor the source of the funds for repayment.

(3) On August 20, 1965, $299,822.62 was paid out of the Mid-Western bank account, completely closing the account. No evidence relative to the manner in which this was accomplished or the use to which the funds were put has been introduced into evidence.

---

[8] We recognize that, as drafted, the blanket indemnity by petitioner necessitated such an undertaking, but the more rational way to have handled this would have been simply to exclude the subch. S continuation requirement from the indemnity.

(4) Among petitioner's purposes for divesting himself of his interest in Mid-Western was that he was involved, full-time, in the operation and management of Alexander Hamilton, but no evidence was offered to explain why the divestiture took the form of a sale of the shares, aside from the anticipated tax advantages.

(5) Any business purpose Rousseau and Santeiro may have had for acquiring Mid-Western, beyond the fact that its sole asset was $299,822.62 cash ($36,980.36 greater than the purchase price) and their purported offsetting tax losses, was never elucidated.

(6) Three days subsequent to the August 20, 1965, transaction, Rousseau and Santeiro adopted a resolution of liquidation for Mid-Western. A certificate of dissolution filed with State authorities on December 23, 1965, had been signed on September 7, 1965. No evidence as to when the plan of liquidation was conceived has been presented.[9]

It is against this background that we proceed to a resolution of the threshold issue and the underlying problem of the burden of proof. We start off with the well-established and oft-cited proposition that the taxation of a particular transaction depends upon its substance, not the form into which the taxpayer has chosen to cast it. *Commissioner v. Court Holding Co.,* 324 U.S. 331, 334 (1945); *Higgins v. Smith,* 308 U.S. 473, 476 (1940); *Griffiths v. Helvering,* 308 U.S. 355, 357–358 (1939); *Waterman Steamship Corporation v. Commissioner,* 430 F. 2d 1185, 1192–1193 (5th Cir. 1970), revg. on other grounds 50 T.C. 650 (1968); *Aaron Kraut,* 62 T.C. 420, 428 (1974). Tempering this proposition, however, is the equally well-recognized proposition that, "The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted." *Gregory v. Helvering,* 293 U.S. 465, 469 (1935). The synthesis of these two propositions can be expressed as follows: "The building may not be constructed entirely from the tax advantage, but, if the foundation and bricks have economic substance, the economic or financial inducement of the tax advantage can provide the mortar." See *W. Lee McLane, Jr.,* 46 T.C. 140, 145 (1966), affd. per curiam 377 F. 2d 557 (9th Cir. 1967).

Petitioner asserts that the transaction was, in all respects a valid sale to third parties negotiated at arm's length and the fact

---

[9] Our order of listing of the established facts or inconclusive elements should in no way carry any implication as to their relative importance.

that beneficial tax advantages accrued to petitioner is merely a fruit of good tax planning. However, "When one purports to sell cash in corporate solution the burden is surely particularly severe on the seller to show that the only purpose served is not tax avoidance." *John D. Gray,* 56 T.C. 1032, 1069 (1971), on appeal (9th Cir., Sept. 18, 1974). Petitioner has not begun to carry that burden. His reason for selling out was that he was too busy at Alexander Hamilton to play any role at Mid-Western. While this may explain his reasons for terminating his relationship with Mid-Western, it certainly does not explain the reasons for negotiations and the cumbersome process of a sale. The record reflects no evidence to show that Mid-Western was a viable corporate entity at any time subsequent to July 12, 1965, the date on which the last sale of cattle apparently took place. It had ceased all activities by that time. See *John D. Gray, ibid.* Thus, petitioner could merely have left it to die a natural death. Any business reasons Santeiro and Rousseau may have had for purchasing Mid-Western is something about which we are merely left to guess. In hindsight, it seems clear that they had none. See *Waterman Steamship Corporation v. Commissioner,* 430 F. 2d at 1193 n. 18; cf. *Davant v. Commissioner,* 366 F. 2d 874, 880–881 (5th Cir. 1966), affg. on this issue 43 T.C. 540, 566–567 (1965); *John D. Gray,* 56 T.C. at 1068–1069.

In light of the foregoing and our evaluation of the record as a whole, we conclude:

(1) Petitioner has not carried his burden of proof that he did any more than transfer his interest in Mid-Western's cash from one pocket to another, albeit using different trousers. As the Supreme Court said in *Minnesota Tea Co. v. Helvering,* 302 U.S. 609, 613 (1938), "A given result at the end of a straight path is not made a different result because reached by following a devious path." Accordingly, we hold that as to the taxable year 1965 petitioner should be treated as having received a distribution of earnings and profits from Mid-Western.[10] See sec. 1373(b).

(2) As to the issue of transferee liability in respect of Mid-Western's taxable year 1964, such gaps in the record as may exist do not deny us the ability to draw reasonable inferences from the evidence before us. *McDermott v. John Baumgarth Co.,* 286 F.

---

[10] There is no dispute that Mid-Western's current and accumulated earnings and profits were in excess of the amount of such distribution.

2d 864, 868 (7th Cir. 1961); *Willett v. Commissioner*, 277 F. 2d 586, 589 (6th Cir. 1960). Based upon such evidence and the reasonable inferences drawn therefrom, we conclude that there is sufficient evidence in the record to establish a prima facie case that the "sale" by petitioner to Santeiro and Rousseau was not bona fide. Such being the case, the burden was on petitioner to come forward with countervailing evidence sufficient to overcome respondent's prima facie case, which he has not done. *Benoit v. Commissioner*, 238 F. 2d 485, 492 (1st Cir. 1956), vacating and remanding on other grounds 25 T.C. 656 (1955); *Robinette v. Commissioner*, 139 F. 2d 285, 288 (6th Cir. 1943); *George M. Newcomb*, 23 T.C. 954, 961 (1955). Accordingly, we hold that petitioner is liable as a transferee for any deficiency in the income taxes of Mid-Western for the 1964 taxable year.

The remaining issue is whether the cattle feed expense, prepaid by Mid-Western in its 1964 taxable year, is properly deductible by Mid-Western in that year. This issue has been extensively explored by this and other courts and reflects a confused history characterized by varying guidelines and governing principles. See *Mann v. Commissioner*, 483 F. 2d 673 (8th Cir. 1973), revg. T.C. Memo. 1972–162, and cases collected therein; Pinney & Olson, "Farmers' Prepaid Feed Expenses," 25 Tax Lawyer 537 (1972). Moreover, there has been an evolutionary decisional process starting with *R. D. Cravens*, 30 T.C. 903 (1958), revd. 272 F. 2d 895 (10th Cir. 1959), and continuing through *Mann v. Commissioner, supra*. Such being the case, it is obvious that the early guidelines and principles may no longer have their original vitality. Perhaps the only eternal guideline or principle that can be gleaned from prior decisions is that each case must be decided in light of its particular facts and circumstances. Cf. *Tim W. Lillie*, 45 T.C. 54 (1965), affd. per curiam 370 F. 2d 562 (9th Cir. 1966).

Concededly, Mid-Western was an absentee cowboy; it did not customarily participate in cattle-raising activities. Moreover, the potential tax benefits were substantial and were clearly a motivating factor in its determination to engage in the transactions involved herein. While these circumstances should not per se deprive Mid-Western of those benefits, they clearly justify careful scrutiny of the terms of the contractual arrangements which were utilized and the manner in which those

arrangements were implemented. See *Cravens v. Commissioner*, 272 F. 2d 895, 898 (10th Cir. 1959), revg. 30 T.C. 903 (1958).

Moreover, in approaching our decision, we assume, for the purposes of this case, that the "tax treatment of advance payments for livestock feed" is a sui generis proposition to which principles governing other types of advance payment do not apply. See *Mann v. Commissioner*, 483 F. 2d at 676. In so doing, we do not imply that such principles might not be applied in other cases involving livestock feed. Finally, we will also accept, for the purposes of this case, the mandate of the Eighth Circuit Court of Appeals that the key to the resolution of the question before us is "refundability." See *Mann v. Commissioner*, 483 F. 2d at 678. In view of our conclusion that the advance payments by Mid-Western were refundable, we need not decide the extent to which we will adopt this narrow test in other situations where the advance payments are found to be nonrefundable, but it may nevertheless be proper to conclude that deductibility in the year of payment should not be permitted. Compare *Casco Products Corp.*, 49 T.C. 32, 37 (1967). That conclusion also makes it unnecessary for us to deal with the "ordinary and necessary" business expense requirement of section 162—an aspect that has commanded the attention of the courts in previously decided cases.[11]

In the foregoing context, we address ourselves to the question whether the advance payments by Mid-Western were refundable.

Under the terms of paragraph 6 of the contracts, Mid-Western agreed to "purchase feed from the FEEDER AND FEEDER [agreed] to deliver to the OWNER at the commencement of [the] contract [a specified number of] DOLLARS of feed per head." The dollar amount was negotiated in light of the current price of the feed as related to the type and size of the animal to be fattened, the geographical area where the cattle were to be raised, and the type of feed involved. Neither the type of feed nor the amount of each type was specified. While it may well be that the absence of such specificity is not determinative (see *Mann v. Commissioner*, 483 F. 2d at 680), it seems to us that it is an element to be considered in determining whether a payment is refundable. The fact of the matter is that such specificity was present in every decided case

---

[11] Respondent has conceded that the amount in question is in any event deductible in 1965. Respondent has also allowed a deduction in 1964 for that portion of the expense representing feed consumed in 1964. See n. 2 *supra*.

with the exception of *Estate of Frank Cohen*, T.C. Memo. 1970–272 (contract 204 KA), and in that situation the taxpayer did not prevail.[12] But we need not rest our decision upon lack of specificity because of other elements in the transactions involved herein.

Petitioners place heavy reliance on the fact that the contracts provided for a fixed price for the feed and that Mid-Western was therefore not at the risk of the market in respect of its obligation to pay for feed. Clearly, this element should not be determinative—obviously, if the parties to a contract so intend, an advance payment based on a fixed price can be a deposit. Nevertheless, such an element is entitled to considerable weight. The difficulty in according it such weight herein lies in the fact that adjustments were to be made between the parties to the contracts depending upon the weight gain achieved. If the prescribed level of weight gain was exceeded, the feeder was entitled to receive a bonus payment from Mid-Western and, indeed, under two of the four contracts, Mid-Western was charged with such a bonus. Even this factor of an upside risk would not necessarily compel the conclusion that the advance payments were deposits (cf. *Cravens v. Commissioner, supra,* and *John Ernst,* 32 T.C. 181 (1959)) if Mid-Western had not been entitled to credit on the downside. But the agreements provided that, to the extent that the prescribed weight gain was not met, Mid-Western was entitled to receive a penalty payment from the feeder and in the remaining two contracts it was credited with such a penalty. In such a context, and keeping in mind that the advance payment was negotiated in light of the anticipated feed requirements of the cattle involved, we think that the bonus and penalty provision simply reflects an intended quantitative adjustment in the feed payment depending upon future events and thus points in the direction of a deposit.

Even provision for such an adjustment would not per se cause petitioner to fail. Thus, petitioner contends that Mid-Western was entitled to receive a refund of feed only if the contracts were terminated for specific causes such as death, bankruptcy, or insolvency of the feeder. Concededly, paragraph 13 of the contract so provides, and, since none of such events appears to have occurred, no feed was ever returned in kind to petitioner.

---

[12] In contract 205 KA, with respect to which the taxpayer did prevail, the quantity and quality of the feed were specified.

The difficulty with petitioner's contention, however, is that, as has already been pointed out, Mid-Western in fact did receive adjustments by way of dollar credits when the weight gain was insufficient to absorb the advance payment. Significantly, both the credit *and* the charge adjustments (where the advance payment was more than absorbed by the weight gain) were made at the same per-pound rate used in the calculation of the advance payment. In short, the feeder, not the owner, bore the risk of the market, *in both directions,* on the imputed unused feed. Surely this is inconsistent with the proposition that the feed was purchased by Mid-Western in 1964.

Another element casts a further shadow over petitioner's contention. Paragraph 8 of the contracts contains a guarantee that Mid-Western's net loss would not exceed $5 per head. This paragraph does not simply provide that Mid-Western would not be called upon to pay in excess of $5 per head toward any loss that might occur. It provides that "the FEEDER will *refund* to the OWNER any and all sums in excess of the stated loss per head." (Emphasis added.) Thus, the paragraph goes beyond a mere exchange of an obligation to contribute additional funds beyond $5 per head to cover losses for the feeder's right to share in profits to the extent of 50 (or 60) percent. Since a total of 2,199 head of cattle were involved in the four contracts, Mid-Western could not have been out-of-pocket more than $10,995 out of the $212,885 advance payments, even if other expenditures of Mid-Western for the cattle, interest, etc., are ignored. This limitation on Mid-Western's exposure overrides the unlikely but theoretical possibility that a catastrophic drop in cattle prices combined with a huge weight gain might have, in the absence of such limitation, produced bonuses large enough to absorb all of the advance payments.

Although the issue is not entirely free from doubt, we conclude upon the basis of all the facts and circumstances revealed by the record herein that the advance payments by Mid-Western in its 1964 taxable year were deposits.[13] Accordingly, we sustain respondent's determination of the amounts disallowed as a deduction in that year.

Reviewed by the Court.

*Decisions will be entered under Rule 155.*

---

[13] Cf. *Estate of Frank Cohen,* T.C. Memo. 1970–272 (contract 204 KA).

HALL, *J.,* did not participate in the consideration and disposition of this case.

FAY, *J.,* dissenting: The outcome of this controversy depends upon whether the transaction of August 20, 1965, constituted a sale in substance as well as in form. The resolution of that issue ultimately entails drawing a legal conclusion. To that extent it is appropriately considered by this Court in conference. Before such a conclusion may be drawn, however, the facts surrounding the transaction in question must have been ascertained on the basis of the record and such inferences as are reasonably drawn therefrom. Judgments in respect of such matters are, in my opinion, properly made by this Court in the person of the trial judge, acting within the parameters established in the form of presumptions in aid of one or another of the parties.

Under the circumstances obtaining in this instance as the trial judge believes them to have been,[1] the transaction of August 20, 1965, ought warrantably to be accorded sale treatment. *Gregory v. Helvering,* 293 U.S. 465 (1935). In arriving at their decision, however, the majority appear to have disregarded testimony which the trial judge found credible and forthright[2] and to have found it necessary to draw inferences which he did not see fit to draw respecting matters as to which direct evidence is lacking.[3] By reason of their having done so, I find it necessary to dissent from their opinion.

IRWIN, *J.,* dissenting: As the trier of fact in this case I have reached a conclusion different from the majority with respect to the "threshold issue"—was there a bona fide sale? I am concerned that the majority has overstepped the burden of proof requisites and has placed unreasonable burdens upon petitioner because of the admitted tax-shelter device involved. Although I agree that we are required to give close scrutiny to such devices in circumstances such as here, our duty is to interpret and apply the law as it has been enacted by Congress, even if that result is

---

[1] See generally the dissenting opinion of Judge Irwin.

[2] See par. 1 on p. 13 of the majority's opinion and the third paragraph on p. 21 of the dissenting opinion of Judge Irwin.

[3] See par. (2) on pp. 15-16 of the majority's opinion.

sometimes incongruous with our own beliefs as to what the law should allow. The Code is not a perfect instrument; its wording allows some to obtain tax advantages many think undesirable from a tax policy point of view and perhaps even socially unjust. In this instance it appears to me that the majority projects itself beyond the role of the trier of facts with due regard to the burden of proof and strikes down an otherwise bona fide sale. In doing this the majority decides against petitioner primarily on the basis of what evidence could or should have been presented rather than what was presented.

Although I agree that the record is not conclusive, in my judgment petitioner has presented sufficient evidence to refute the presumption of correctness of respondent's determination and has established a prima facie case in favor of a bona fide sale. This prima facie case was not rebutted by respondent.

In emphasizing "gaps" in the evidence the majority in my judgment overlooks the fact that this evidence (or lack of evidence) for the most part is not relevant to the precise issue, namely, whether or not a bona fide arm's-length sale occurred.

I find the evidence persuasive that Santeiro and Rousseau and their professional advisers were independent third parties. While it is true that we need not accept at face value the testimony of an interested party, it is also true that we can give weight to such uncontradicted testimony. I found the testimony herein credible, forthright, and uncontradicted.

One of the "gaps" which the majority stresses, for example, is the lack of evidence regarding the loan from the Bank of Nova Scotia to the buyers which was used to buy Mid-Western's stock. What is important to me in this regard, as the evidence now stands, is the fact that petitioner was not privy to this transaction and that the stock transaction was not finalized by the mere transfer of corporate cash. Compare *John D. Gray*, 56 T.C. 1032 (1971).

Nor do I believe Rousseau's and Santeiro's activities with respect to Mid-Western, after the sale, to be relevant. These activities were independent and distinct from the sale. Petitioner had no voice in whether Mid-Western continued its existence after the sale. No evidence was presented suggesting the existence of any prearranged plan of liquidation.

Although agreeing that there were business motives on petitioner's part for the transaction, the majority emphasizes the fact

that there was no explanation as to why the divestiture took the form of a stock sale, "aside from the anticipated tax advantages." There is nothing reprehensible in casting one's transaction in such a fashion as to produce the least tax so long as the transaction does not depend upon sham or artifice. *Gooding Amusement Co.*, 23 T.C. 408, 418 (1954), affd. 236 F. 2d 159 (6th Cir. 1956). See also *Gregory v. Helvering*, 293 U.S. 465 (1935); cf. *Daniel D. Palmer*, 62 T.C. 684 (1974).

In effect, the majority concludes that although petitioner had a valid reason for terminating his relationship with Mid-Western, his choosing the most advantageous way, from a tax standpoint, to sever this relationship so taints his motives that he should be denied the tax advantage he sought.

It is true that there are judicial limits as to what a taxpayer may do. The majority has aptly noted the following cautionary language in *Minnesota Tea Co. v. Helvering*, 302 U.S. 609, 613 (1938): "A given result at the end of a straight path is not made a different result because reached by following a devious path." Petitioner, however, is not employing a devious path. The Code provides various methods for terminating a shareholder-corporation relationship. A controlling shareholder has the option of selling his stock or liquidating his corporation. Normally, the results are the same. However, as in this instance, where the shareholders have made a subchapter S election, the Code sanctions differing results, dependent upon whether there is a sale or liquidation.

Broadly speaking, in the case of a nonelecting corporation, the corporation is taxed on its income, whereas an electing corporation is not taxed on its income—the income is passed through the corporation to the shareholders and taxable to them. Consequently, if a subchapter S corporation is liquidated, the shareholders are taxed on the income. However, if the stock of the subchapter S corporation is sold, only the shareholders who are such at the close of the corporation's taxable year are taxed on the income. See sec. 1373(b). Unlike the provisions in section 1374 for net operating losses, there is no allocation of income to shareholders who were not such at the close of the taxable year. This is a congressional sanction of assignment of income and the genesis of the tax benefit herein.

It is clear that a transaction such as this must be carefully scrutinized to ensure that the substance corresponds to the form.

*Griffiths v. Commissioner,* 308 U.S. 355, 357–358 (1939). *Higgins v. Smith,* 308 U.S. 473, 476 (1940); *Aaron Kraut,* 62 T.C. 420, 428 (1974); *John D. Gray, supra* at 1069; *Jack E. Golsen,* 54 T.C. 742, 754 (1970), affd. 445 F. 2d 984 (10th Cir. 1971); cf. *Athenaise M. Hill,* 63 T.C. 225, 242–249 (1974). In my judgment, petitioner has passed the test. In reaching this result I have given consideration to the cumulative effect of the "gaps" relied upon by the majority. However, when I balance this against the positive unrebutted evidence presented by petitioner, I must conclude that he should prevail.

The fact that Mid-Western was not engaged in the active conduct of a trade or business should not change the result. Cf. *Moline Properties, Inc. v. Commissioner,* 319 U.S. 436 (1943); *William B. Howell,* 57 T.C. 546 (1972). Nor should the result be different merely because the corporation's sole asset was cash. This only goes to the burden on the taxpayer to show substance to the transaction. Cf. *John D. Gray, supra.*

Since I have determined that the transaction was in substance a sale and not a liquidation, I would find that petitioner properly reported the gain from the sale as long term. Likewise, I would find that petitioner is not liable as a transferee. Respondent bases this contention solely on the sale versus liquidation issue which I would have found in favor of petitioner.

Not finding transferee liability, I would not reach the cattle feed issue.

FORRESTER and SCOTT, *JJ.,* agree with this dissent.