JAMES A. SMITH, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Smith v. Commissioner
Docket No. 1300-74.
United States Tax Court
T.C. Memo 1976-279; 1976 Tax Ct. Memo LEXIS 122; 35 T.C.M. (CCH) 1246; T.C.M. (RIA) 760279; September 2, 1976, Filed *122 Petitioner, a cash basis taxpayer, entered into two cattle feeding programs in 1969 and one such program in 1970. (1) To finance the first 1969 program petitioner, through an agent, borrowed funds and made an advanced payment for feed and services to the cattle feeder. Held, such payment represented a refundable deposit and is not deductible in the year made. (2) Held further, in connection with the second 1969 transaction petitioner made no advance payment in 1969 and is entitled to no deduction therefor in 1969. (3) Held further, in connection with the 1970 program petitioner made no payments for feed and other expenses until 1971 and is entitled to no deductions therefor in 1970. Paul E. Anderson, for the petitioner. Edward B. Simpson, for the respondent. STERRETT
MEMORANDUM *123 FINDINGS OF FACT AND OPINION STERRETT, Judge : Respondent determined deficiencies in petitioner's federal income taxes for the calendar years 1969 and 1970 in the amounts of $9,041.69 and $3,669.25, respectively. In an amendment to his answer to the petition, respondent asserted that petitioner was liable for a deficiency in income tax for the calendar year 1970 in the amount of $7,660.02 in the event that we uphold petitioner's position with respect to the calendar year 1969. The sole issue for our consideration is whether petitioner is entitled to deduct claimed farm expenses for the years 1969 and 1970, respectively, incurred in connection with petitioner's participation in a cattlefeeding program. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioner, James A. Smith, M.D. (hereinafter petitioner), resided in Millbrae, California at the time he filed his petition herein. Petitioner filed both original and amended federal income tax returns for the calendar years 1969 and 1970, utilizing the cash method of accounting, with *124 the Internal Revenue Service. During the period July 1, 1968 through June 30, 1969, petitioner was employed as an intern by Huntington Memorial Hospital in Pasadena, California, and received approximately $3,000 for services rendered in that capacity. He then commenced his employment with San Gabriel Community Hospital [1] which continued until his induction into the United States Navy in late 1969 or early 1970. In early 1969 petitioner became aware that he would ultimately be inducted and anticipated his naval salary to be approximately $12,000 per year. On December 1, 1969, petitioner and Prudential Management Company (hereinafter PMC) entered into an agreement pursuant to which PMC was to acquire 150 head of cattle on behalf of petitioner. That agreement, in pertinent part, provides: In consideration of the mutual promises, it is agreed as follows: 1. Cattle Operator [petitioner] is engaged in feeder cattle operations. Cattle Operator hereby appoints Prudential Management Company as his agent for all purposes in connection with his feeding operations. The services *125 to be rendered by Prudential Management Company and the authority granted Prudential Management Company are as set forth herein. 2. Cattle Operator hereby instructs Prudential Management Company to purchase 150 (100 calves, 50 steers) head of cattle on his behalf. head of cattle are to be purchased each month over the next one month. * * * It is understood that cattle purchased and fed may be placed by Prudential Management Company with commercial feed lots who in the normal practice of the industry may place the cattle with other cattle being purchase, fed and/or sold to slaughter houses. Separate records, however, shall be maintained concerning Cattle Operator's cattle and the costs relating thereto, and such records shall be available to Cattle Operator at all reasonable times. 3. Cattle Operator has paid Prudential Management Company $6,600 representing the down payment for the purchase price of the cattle, costs of feeding and selling cattle, and other miscellaneous charges. The balance of the amounts necessary in connection with the operation of Cattle Operator's feeding herd shall be arranged through bank financing. * * * 4. Prudential Management Company *126 shall be paid $4.00 per head for cattle purchased on behalf of Cattle Operator, of which amount $1.00 represents financing charges and the balance a commission to Prudential Management Company. In addition, Prudential Management Company shall be entitled to 20% of the net profits derived from the sale of the cattle purchase hereunder. * * * 5. Prudential Management Company in pursuance of the authority granted under this Agreement, shall, in the absence of specific direction by Cattle Operator, act on Cattle Operator's behalf in the purchase of the cattle, the feeding and care of such cattle, arrangements with commercial feed lots, the purchase of feed, the determination of the feeding program, and the timing of the sale of the cattle. In addition, subject to Cattle Operator's written instructions to the contrary, Prudential Management Company has a power of attorney to arrange loans from banks or other sources and to impose a lien upon Cattle Operator's feed and cattle. * * * 6. If the cattle are purchased over a period of time, upon thirty days' written notice to Prudential Management Company in advance of the next purchase date, Cattle Operator may terminate the authorization *127 to acquire the balance of the cattle not yet purchase, provided however, that the cattle already purchased on behalf of Cattle Operator shall continue to be fed and sold according to the procedures followed in the customary operation of commercial feed lots and the authority of Prudential Management Company with regard to such cattle shall continue unless specifically terminated. The balance of the down payment not applied as of the date of termination shall be retained by Prudential Management Company and may be refunded only upon the ultimate sale of the cattle already purchased. Cattle Operator shall not be entitled to a refund of any portion of the commission or financing charge under Paragraph 4 and Prudential Management Company shall be entitled to its portion of the net profits pursuant to Paragraph 4. No portion of feeding costs, feed, or other items at any time paid shall be refunded. In the latter part of 1969 Wolfsens' Feed Lots, Inc. [2] (hereinafter Wolfsens) and PMC entered into an arrangement pursuant to which Wolfsens would acquire, feed, and market the cattle that PMC had contracted to acquire for various individuals. In December 1969 two such transactions involved *128 the acquisition of cattle for petitioner. The first such transaction involved an order placed by PMC with Wolfsens for 1,500 head of cattle to be purchased for 13 individuals one of whom was petitioner. (This order was at various times referred to by the following numbers: 32,000; 32; 320; 3,200. For convenience it will be referred to as Order 32.) The portion of Order 32 allocable to petitioner was 100 head of cattle and PMC, on behalf of petitioner, tendered to Wolfsens $4,000 therefor. Wolfsens prepared an invoice for the feed and other charges for the cattle in Order 32 that were acquired for petitioner. That invoice shows the following: Pounds of
Charges per Description
Feed
Ton
Charges
No. 1 Feed
216,156
$53.23
$ 5,753
No. 2 Feed
51,889
57,43
1,490
No. 3 Feed
38,138
62.51
1,192
No. 5 Feed
201,563
66.53
6,705
Veterinary Expense
200
Interest at 9-1/2%
900
$ 16,240
Cash Discount
240
$ 16,000
The above feed prices were based upon the market *129 price of feed at the time of the issuance of the invoice and upon an estimate of the feed ultimately to be consumed by petitioner's cattle.The charges per ton also included a fee charged by Wolfsens for future services such as mixing feed and preparing cattle for market. On behalf of petitioner, PMC executed a promissory note on December 30, 1969, payable to Central Valley Finance Company in the amount of $16,000. The note, which fell due on December 30, 1970 and bore interest at the rate of 10 percent, provided that the cattle feed to be purchased with the loan proceeds constituted the security for the note. Central Valley Finance Company then issued a check dated December 30, 1969, in the amount of $16,000 to PMC which in turn issued a check in the same amount and bearing the same date to Wolfsens. [3]
*130 In late 1969 and early 1970 Wolfsens acquired the cattle to fill Order 32, placed them in lots and commenced the feeding program. [4] In accordance with Wolfsens' accounting practice, invoices setting forth actual feed charges incurred in connection with Order 32 were prepared. The charges were then recorded on Wolfsens' books as debits to the accounts receivable account and were credited to the sales account. The feed charges were all recorded during 1970 with the exception of one posting dated December 31, 1969, in the amount of $728.42 for Lot 732. With respect to Order 32, the feed charge included a fee for services performed by Wolfsens in connection with feeding the cattle. Such services included costs of mixing feed, caring for the cattle, and preparing the cattle for market. The charge for the feed itself was based on current market price *131 and at various times exceeded the per ton charge set forth in the initial invoice pertaining to petitioner's cattle. In 1970 the cattle comprising Order 32 were sold and Wolfsens prepared a "Cattle Feeding Settlement" sheet relative to petitioner. The settlement sheet reflects the following figures among others: Sales Proceeds
$28,128.96
Feed purchased
$14,900.00
Feed used
12,815.92
Feed inventory
$ 2,084.08 [5]
Note to Central Valley
$16,000.00
Payment
13,915.92
Balance
$ 2,084.08
Veterinary Expense
$ 869.43
Prior Vet Payment
[200.00]
Balance
$ 669.43
Interest
$ 1,446.61
Prior Payment
[900.00]
Balance
$ 546.61
The second 1969 transaction in which petitioner participated commenced with PMC placing Order 49,000 with Wolfsens in December. (This order is at various times in the record referred to as Order 49, 490, or 49,000. For convenience it will hereinafter be known *132 as Order 49.) The order was for 1,100 head of cattle for nine individuals including 50 head for petitioner. The 100 head included in Order 32 and the 50 head included in Order 49 comprise the total head petitioner agreed to acquire in the aforenoted contract between petitioner and PMC. In connection with Order 49, PMC transferred to Wolfsens $2,000 (the source of which was the $6,600 transferred by petitioner to PMC) as a deposit on behalf of petitioner. The total amount so transferred was $44,000 which was recorded on Wolfsens' accounts receivable ledger on December 31, 1969. The accounts receivable ledger also shows a disbursement of $44,000 on the same date. On December 30, 1969, PMC executed a promissory note in favor of Central Valley Finance Company in the face amount of $8,000 which fell due on December 30, 1970. Wolfsens, however, did not acquire and feed the cattle in Order 49 and received no funds for feed including the aforenoted $8,000. Rather, Wolfsens transmitted the aforenoted $44,000 deposit to the Noble Land and Cattle Company (hereinafter Noble) in March 1970 after which Noble acquired and fed the cattle in Order 49. In connection with this transaction *133 Noble charged all feed and other expenses to its account for Order 49. The charge for feed included a charge for services, and Noble charged interest on the balance in this account. [6] Noble also paid interest on the $44,000 deposit that it had received from Wolfsens. After the sale [7] of the cattle comprising Order 49, a settlement sheet for petitioner was prepared showing among other things, the following: Feed Inventory Analysis
Total
Feed
Veterinary
Purchase
$7,550.00
$7,450.00
$100.00
Usage
5,631.88
5,543.04
88.84
$1,918.12
$1,906.96
$ 11.16
Note to Central Valley Finance Original Balance
$8,000.00
Payment
6,081.88
Balance
$1,918.12
Interest
$ 500.69
Prior Payments
450.00
Balance
$ 50.69
On his federal income tax return for 1969 petitioner claimed the following deductions in connection *134 with the aforementioned transactions: Amount [8]
Interest
$ 1,350
Feed
22,350
Vet Fee
300
PMC Management Fee n9
600
$24,600 Respondent, in his notice of deficiency, disallowed all of the aforenoted deductions with the exception of the interest expense as follows: (a) Your farm loss relating to feed lot operations is adjusted in the amount of $23,250.00 in 1969 * * *. The deductions for feed and other expenses are not allowed because cash basis taxpayers can only deduct expenses when actually paid; the execution of notes in this case does not constitute payment. Further, even if such amounts are considered to have been paid during the taxable year, (1) they constitute deposits on future goods rather than payment; (2) they were *135 not made for a business purpose but for tax avoidance, and (3) their deduction results in a material distortion of income. As noted above, with respect to Order 32 the inventory balance in the amount of $2,084.08 shown on the settlement sheet pertaining thereto was applied to repay the loan balance for petitioner's benefit. Petitioner filed an amended return for the year 1969 on which he reported as additional income this amount together with $1,918.12 inventory balance shown on the settlement sheet for Order 49 as unused cattle feed. [10] Respondent did not take the 1969 amended return into consideration in making his determinations for that year. Pursuant to an agreement between petitioner and Wolfsens dated December 31, 1970, Wolfsens acquired 100 head of cattle for petitioner which were designated either as Order I-12 or 720. In connection with Order I-12 petitioner paid to Wolfsens a deposit in the amount of $3,700. Wolfsens prepared an invoice for feed and other charges pertaining to Order I-12 which *136 is set forth in pertinent part below: Pounds of
Tons of
Charges Description
Feed
Feed
Per Ton
Charges
Alfalfa Hay
53,313
26.656
$ 39.00
$ 1,039.60
Alfalfa Cubes
43,538
21.769
40.00
870.75
Barley
272,195
136.098
61.50
8,370.00
Molasses
40,059
20.030
40.44
810.00
Beet Pulp
53,129
26.565
65.84
1,749.00
Milo
53,477
26.739
55.50
1,484.00
Fat
7,001
3.500
170.98
598.50
Mineral
14,110
7.055
53.60
378.15
Cash Discount
(300.00)
Total Charges this Month
$15,000.00
Interest
1,000.00
$16,000.00 These prices, estimates of the feed to be consumed by petitioner's 100 head at the current market price, included service charges. In 1970 Wolfsens had an arrangement with the Wells Fargo Bank in Los Banos (hereinafter Wells Fargo) pursuant to which Wolfsens' customers obtained loans to finance the acquisition and maintenance of cattle. The customers would execute promissory notes and upon receipt of a financial statement and instructions from the customer, a guarantee from Wolfsens, and a presentation of a bill of sale draft, Wells Fargo would disburse the loan proceeds. Petitioner executed *137 a bill of sale draft dated December 22, 1970, in the amount of $16,000 drawn to the order of Wolfsens on the Wells Fargo account. He also executed a promissory note dated December 22, 1970, in the amount of $30,000. These documents were presented to Wells Fargo on or about January 15, 1971, at which time $16,000 was remitted to Wolfsens. On January 15, 1971, Wells Fargo began charging petitioner interest on this disbursement. In December 1970 and early 1971 Wolfsens acquired the requisite cattle needed to fill Order I-12 and commenced this feeding program. In accordance with its general accounting practice Wolfsens prepared and issued invoices setting forth feed charges which included charges for services. [11] All such charges with respect to Order I-12 were recorded in 1971 with the exception of one December 31, 1970 listing. As the feed was consumed and the invoices issued Wolfsens would debit its accounts receivables and credit its sales account with the appropriate amounts. Wolfsens prepared a settlement statement for *138 petitioner relating to his cattle in Order I-12. That statement reflects the following, among other items: Feed purchased
$15,000.00
Veterinary
$ 288.70
Feed used
13,515.43
Prior Payment
0
Feed inventory
$ 1,484.57 [12]
Note (Wells Fargo)
$16,000.00
Interest (on feed)
$ 800.20
Balance due petitioner
2,659.79
Prior Payment
(1,000.00)
Balance due petitioner
$ 199.80 In connection with Order I-12 petitioner claimed as deductions on his 1970 return the following: Interest
$ 1,597.50
Feed
15,512.87
Vet
1,501.63 On his amended return for 1970 petitioner reported additional income in the amount of $1,484.57 representing the feed inventory not consumed in 1971. Respondent, in the portion of his notice of deficiency relating to 1970, disallowed the claimed deductions for feed and veterinary medicine and increased petitioner's income by the amount of the feed deducted but not consumed *139 in 1971. [13] Respondent further recomputed the gain (or loss) from the sale of petitioner's cattle in Orders 32 and 49 and in so doing, reduced petitioner's gain (thereby producing a loss) by the amount of $23,250 which amount represents the amount of the deductions that respondent disallowed for 1969. By way of amendment respondent now asserts that, should we find petitioner is entitled to these deductions for the year 1969, they should not be considered in computing petitioner's tax liability for 1970 and that petitioner must also recognize additional income in the amount of $4,002.20 representing the amount refunded to petitioner in connection with Order 32 and the amount of unused feed inventory shown on the settlement sheet for Order 49 for which petitioner never paid. OPINION The parties agree that during all relevant periods petitioner was a farmer engaged in the cattle raising business and is entitled to deduct those expenses related to this business pursuant to section 162, I.R.C., 1954[14] and section 1.162-12, Income Tax Regs.n15 The controversy relates solely to the proper timing of the deductions *140 in question. We must decide whether petitioner is entitled to deduct those amounts claimed for feed and other expenses on his 1969 return in 1969 or in 1970. Similarly, we must also decide whether petitioner is entitled to deduct those amounts claimed for feed and other expenses on his 1970 return in 1970 or in 1971. *141 Petitioner argues that he entered the cattle feeding business for bona fide business considerations and prepaid his expenses in connection therewith in order to fix the price of feed and to obtain a cash discount. He contends, therefore, that having actually paid for feed and other expenses in the years claimed, he is entitled to deductions for such outlays as ordinary and necessary business expenses in those years. He further argues that, since his deductions fall within the scope of section 162, they are proper notwithstanding the fact that tax considerations may have in some manner been a motivating factor in his entrance into the cattle feeding business. Respondent takes the position that the deductions are not proper in the years claimed for several (alternative) reasons. These are: (1) petitioner did not actually pay for the feed and other expenses in the years claimed; (2) if petitioner did tender payments as claimed, such payments are nondeductible deposits; (3) if the payments were made and were not deposits, they were made for the purpose of tax avoidance; and (4) the deduction of such amounts results in a material distortion of petitioner's income. Section 162 *142 and section 1.162-12, Income Tax Regs., allow for the current deduction of expense items paid or incurred by a farmer in carrying on his trade or business. We completely agree with petitioner that, notwithstanding any tax motives that might have prompted his decision to engage in cattle raising, as a qualified farmer he is entitled to deduct that which the law permits. Cravens v. Commissioner,272 F. 2d 895 (10th Cir. 1959), revg. 30 T.C. 903 (1958). However, the governing provisions allow deductions for "amounts actually expended * * * insofar as such costs represent actual outlay." Sec. 1.162-12(a), Income Tax Regs. Hence, petitioner bears the burden of demonstrating that he did in fact transfer the amounts deducted in the years claimed and that such transfers represented payments rather than deposits for future purchases and services. Welch v. Helvering,290 U.S. 111 (1933); Tim W. Lillie,45 T.C. 54 (1965), affd. per curiam 370 F. 2d 562 (9th Cir. 1966); Shippy v. United States,308 F. 2d 743 (8th Cir. 1962), affg. 199 F. Supp. 842 (W.D. S. Dak., 1961). Turning first *143 to Order 32, the facts may be briefly summarized. In December 1969 PMC, as agent for petitioner, ordered 100 head of cattle from Wolfsens. Wolfsens, which was to acquire, feed and market the cattle, thereupon issued an invoice for petitioner containing estimated charges for feed and services in the amount of $16,000. Petitioner financed these costs in the following manner. PMC executed a promissory note in the amount of $16,000, received a check in that amount from Central Valley Finance Company, and issued a check in the amount of $16,000 to Wolfsens on December 30, 1969. The original source of the loan proceeds was Wolfsens which maintained a practice of advancing funds to the Central Valley Finance Company for loans to its [Wolfsens'] customers. Subsequent to the sale of the 100 head, Wolfsens prepared a settlement sheet for petitioner's account showing the feed inventory and the balance due on the note both to be $2,084.08. This amount was transmitted to Central Valley Finance Company in partial satisfaction of petitioner's loan.In connection with Order 32 petitioner claimed, and respondent disallowed, deductions for feed and services, veterinary expenses, and management *144 expenses on his 1969 return. Respondent's initial contention is that cash or its equivalent did not pass from petitioner to Wolfsens in 1969 for the prospective costs set forth in the invoice. Essentially, respondent takes the position that the formal financing machinations were but smoke obscuring the substance of the transaction. To buttress this contention, he points to and relies heavily on the fact that the financing agreements altered the cash position of no one, and that Wolfsens would ultimately realize its profit from the transaction upon repayment of the notes by or on behalf of, petitioner (to Central Valley Finance Company) and by Central Valley Finance Company (to Wolfsens). In effect, respondent would have us remove the bank from the scenario presented, notwithstanding the check it issued on petitioner's behalf, and recharacterize the transaction as being financed by Wolfsens as if it had received petitioner's note directly. Respondent's second, and alternative, argument is that, in the event we find an identity between the form and substance of the financial mechanics of the transaction, the check represents a deposit rather than an actual payment and is, therefore, *145 not deductible in 1969. The issue presented by respondent's second contention has been the subject of several previous decisions by this and other courts. See Mann v. Commissioner,483 F.2d 673 (8th Cir. 1973), revg T.C. Memo 1972-162 and the cases cited therein. After reviewing these cases we said in E. Keith Owens,64 T.C. 1, 16 (1975), on appeal (6th Cir., December 10, 1975), "[perhaps] the only eternal guideline or principle that can be gleaned from [these] prior decisions is that each case must be decided in light of its particular facts and circumstances." In Mann v. Commissioner,supra, at 678 the Court stated that, "[the] key to this question is refundability." This test was subsequently adopted by this Court in E. Keith Owens,supra, and must ultimately govern the resolution of the issue at hand. After a careful consideration of the record we believe that the $16,000 check issued to Wolfsens on behalf of petitioner represents a refundable deposit, [16] and the portion thereof attributable to feed and other charges made by Wolfsens is not deductible in 1969. *146 We note at the outset that an agreement between Wolfsens and petitioner pertaining to Order 32 is not before us. Hence, we are unable to say with certainty whether or not such agreement contained provisions governing the problem of refundability. Since the burden of proof rests on petitioner, the absence of such agreement would justify us in sustaining respondent on this issue.However, other evidence presented supports our conclusion and merits comment. The advance payments for Order 32 were based upon the estimated charges set forth in the invoice issued by Wolfsens. Although the specifics of any agreement with respect to these charges are not before us, it is clear that no maximum price was established since the actual billing for these items was done on a monthly basis at the current market price, and the monthly charges varied from those set forth in the initial invoice. Subsequent to the sale Wolfsens totaled the charges due from petitioner and, finding them to be less than the advance payment, did in fact refund the difference.[17]
*147 Furthermore, although not determinative, we believe the accounting procedures utilized by Wolfsens in connection with this transaction are significant. Wolfsens treated the prepayments as credits to accounts receivable and recharacterized them as sales only as the feed was consumed or a particular service was rendered. Hence, the amount of any refund to which petitioner was entitled was merely the balance of the credits and debits in the receivables account with respect to petitioner. Thus, Wolfsens and not petitioner bore the risks of market fluctuations in the price of cattle feed, thereby indicating that until consumption, Wolfsens was the true owner of any feed on hand. See E. Keith Owens,supra.
Finally, the charges involved in Order 32 included fees for valuable and significant services to be performed by Wolfsens. That portion of the cost is in reality a deposit for the payment of services to be provided in the future and is deductible only when the services are performed. This fact makes the instant case distinguishable from those cases cited by petitioner. [18]Tim W. Lillie,supra.
*148 We turn next to Order 49. The cattle for that order were acquired and fed by Noble rather than Wolfsens. In connection with this order petitioner transmitted no funds to defray the cost of future feed and services and such costs were charged to the account maintained by Noble for Order 49. Upon sale of the cattle in 1970, Noble prepared a settlement sheet for petitioner (which, in part, has been set forth in our findings of fact) and applied the sales proceeds against the accrued charges. Petitioner claimed deductions, which respondent disallowed, on his 1969 return for feed and services, veterinary expenses and management fees incurred in connection with Order 49. As discussed previously, a cash basis taxpayer may deduct expenses only in the year paid. Since petitioner made no payments in 1969 for feed, services and veterinary expenses with respect to Order 49; respondent's disallowance of the claimed deductions for these items in that year is hereby sustained. Hence, we need not consider whether petitioner must recognize additional income in 1970 in the amount of the feed inventory shown on the settlement sheet prepared by Noble. Finally, we turn to the 1970 cattle *149 feeding venture. In December 1970 petitioner placed with Wolfsens an order for 100 head of cattle and received an invoice for estimated feed and service charges in the amount of $16,000. To finance the potential costs of these items, petitioner, on December 22, 1970, executed a promissory note in the amount of $30,000 and a bill of sale draft in the amount of $16,000. These were presented to Wells Fargo on January 15, 1971, at which time Wells Fargo transmitted a disbursement in the amount of $16,000 to Wolfsens. Following the sale of petitioner's cattle, a settlement sheet was prepared showing an unused feed inventory of $1,484.57. Petitioner deducted the expenses incurred in connection with this order in 1970. Thus, he is entitled to no deduction therefor in that year. However we note that in his notice of deficiency as it pertains to 1970, respondent both disallowed petitioner's prepayment deductions and increased his income by $1,484.57 which amount represents the feed inventory shown on the settlement sheet. Having sustained respondent's disallowance of the deductions, we find such increase to be improper. In view of the foregoing, Decision will be entered under *150 Rule 155. Footnotes
1. Petitioner received wages in the amount of approximately $26,000 from San Gabriel Hospital.↩
2. During the years in issue Wolfsens was a commercial cattle feeder engaged in the business of acquiring, feeding, and marketing cattle for customers.↩
3. The other participants in Order 32 financed their acquisitions in a similar manner. The notes and checks executed by or on behalf of the participants therein, including petitioner, totaled $188,000 which Wolfsens recorded as a credit on its accounts receivable ledger for feed to be consumed by the cattle comprising Order 32. The funds for these loans were advanced to Central Valley Finance Company by Wolfsens. Such advances are shown on the accounts receivable ledger of Wolfsens.↩
4. The cattle comprising Order 32 were placed in lots 732, 171, 86 and 832. Petitioner's 100 head, although part of the overall program, were not segregated and were not individually identifiable. With the exception of 99 steers acquired on December 23, 1969, all of the cattle in Order 32 were acquired by Wolfsens in 1970.↩
5. This amount is simply the balance of the debits and credits shown on petitioner's account. Rather than refund this sum directly to petitioner, Wolfsens transferred this amount to Central Valley Finance Company in partial repayment of petitioner's note.↩
6. The record does not show whether the proceeds from the $8,000 loan were advanced to Noble. However, the documentary evidence does indicate that Noble only received a deposit of $40.00 per head, and received no prepayment for feed and services.↩
7. The proceeds of the sale were applied against the accrued charges.↩
8. Although no breakdown of these amounts appears on petitioner's return, it is apparent that such amounts comprise the following: Order 32
Order 49
Interest
$ 900
$ 450
Feed
14,900
7,450
Vet Fee
200
100
PMC Management Fee
400
200
$16,400
$ 8,200
n9 PMC retained as its fee $600 of the initial $6,600 payment. On brief respondent has conceded the propriety of the deduction of this fee.↩
10. Apparently petitioner never paid for the feed represented by the $1,918.12 and, hence, this amount was never actually returned to him or used for his benefit.↩
11. The basic feed charge was determined on a mix feed basis unlike the estimate invoice which was based on the cost of individual ingredients.↩
12. This amount represents the balance of the debits and credits in petitioner's account. Since the cattle were sold for a price in excess of the balance owed to Wolfsens and the balance due on the note, this amount was remitted to petitioner.↩
13. Respondent did not consider petitioner's 1970 amended return.↩
14. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General.--There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including * * *. n15 Sec. 1.162-12.Expenses of Farmers. (a) Farms engaged in for profit. A farmer who operates a farm for profit is entitled to deduct from gross income as necessary expenses all amounts actually expended in the carrying on of the business of farming. The cost of the ordinary tools of short life or small cost, such as hand tools, including shovels, rakes, etc., may be deducted. The purchase of feed and other costs connected with raising livestock may be treated as expense deductions insofar as such costs represent actual outlay,↩ but not including the value of farm produce grown upon the farm or the labor of the taxpayer. [Emphasis added.]
16. In considering respondent's second contention, we assume arguendo↩ that this payment was actually made. Due to our conclusion we need not consider respondent's initial argument nor need we consider the contentions raised in respondent's amended answer.
17. Petitioner urges that he received no refund since the balance was remitted to Central Valley Finance Company. Since such remittance was for his benefit, we find no merit in this argument.↩
18. Cravens v. Commissioner,supra;John Earnst,32 T.C. 181↩ (1959).