JAMES F. HAYNES AND CECILIA D. HAYNES, et al., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Haynes v. Commissioner
Docket Nos. 5352-77, 6944-77, 7623-77, 7635-77.
United States Tax Court
T.C. Memo 1979-240; 1979 Tax Ct. Memo LEXIS 283; 38 T.C.M. (CCH) 950; T.C.M. (RIA) 79240; June 25, 1979, Filed Edward C. Cazier, Jr.,Richard K. Seltzer, and Michael E. Mills, for the petitioners. Richard W. Kennedy, for the respondent. FEATHERSTON
MEMORANDUM OPINION FEATHERSTON, Judge: In these consolidated cases, respondent determined deficiencies *285 in petitioners' income taxes for 1973 in the following amounts: Petitioners
Deficiency
James F. Haynes and Cecilia D. Haynes
$ 2,758.48
(dkt. No. 5352-77)
Richard A. Colven and Jane B. Colven
2,075.99
(dkt. No. 6944-77)
William B. Gilmore and Doris J. Gilmore
4,025.00
(dkt. No. 7623-77)
Wallace C. Reed and Ann B. Reed
9,347.59
(dkt. No. 7635-77)
The issue for decision is whether American Cattle Feeders, a partnership of which petitioners were limited partners, is entitled to deduct in the year of purchase and payment the cost of feed bought for its cattlefeeding operations when it reasonably anticipated that the feed would be consumed by the cattle in the first 6 months of the traxable year following the year of purchase. The facts, all stipulated, which are essential to our decision may be briefly summarized. When their petitions were filed, petitioners James F. Haynes and Cecilia D. Haynes (Haynes), husband and wife; Richard A. Colven and Jane B. Colven (Colven), husband and wife; William B. Gilmore and Doris J. Gilmore (Gilmore), husband and wife; and Wallace C. Reed and Ann B. Reed (Reed), husband and wife, were legal residents, respectively, *286 of Carlsbad, New Mexico; Honolulu, Hawaii; Georgetown, Texas; and La Canada, California. Petitioners Haynes, Colven, and Reed filed their 1973 joint Federal income tax returns with the Internal Revenue Service Center, Fresno, California. Petitioners Gilmore filed their 1973 joint Federal income tax return with the Internal Revenue Service Center, Austin, Texas. At all relevant times, petitioners used the cash receipts and disbursements method of accounting for Federal income tax purposes. American Cattle Feeders (the partnership), a limited partnership with one general partner and 432 limited partners, was formed on December 6, 1973, under the Uniform Limited Partnership Act of the State of Oklahoma. The partnership's general partner was North American Cattle Company, a Nevada corporation. At all relevant times, the partnership reported its income and expenses using the cash receipts and disbursements method of accounting. The individuals who planned and promoted the partnership began working on the plan in March 1973. Due to problems with the Securities and Exchange Commission and other regulatory agencies, the partnership was not formed until December 1973. At all times *287 during its existence, the partnership was engaged in the business of purchasing, feeding, and marketing cattle and was a "famrer" for Federal income tax purposes. The partnership intended to make a profit from its operations. The expectation that the partnership would be profitable was based upon the analysis and investigation conducted by the general partner before December 1973. Each limited partner intended to make a profit on his investment in the partnership and not merely to achieve tax deferral. The managers of the general partner were individuals experienced in the operation for profit of cattle feedlots in the Oklahoma-Texas panhandle region. The determinations of quantity and weight of cattle and quantity of feed to purchase were made by the managers of the general partner in the exercise of their business judgment. On December 6, 1973, the partnership began its cattlefeeding operations in a leased feedlot in Gruver, Texas. The partnership expected to feed at least 32,000 head of cattle during the first feeding cycle. Depending on the weight of cattle purchased, a feeding cycle may last from 5 to 8 months; a typical cycle is 5 months long. During December *288 1973, the partnership purchased and began to feed 6,019 head of cattle. In 1973, 127 head died, leaving 5,892 on hand at yearend. Between January 1, 1974, and March 31, 1974, inclusive, the partnership purchased 10,109 head of cattle. During this period, 142 head were sold and 289 died, leaving 15,570 head on hand on March 31, 1974. From April 1, 1974, to August 31, 1974, inclusive, the partnership purchased 2,661 head. During this period, 12,433 head were sold and 294 head died, leaving 5,504 head on hand at the end of August 1974. Immediately after its formation, the partnership began purchasing grain to feed its cattle. The partnership purchased $7,363,887 worth of grain during its first short taxable year from December 6, 1973, to December 31, 1973. Of that grain, $461,817 worth was fed to cattle during December 1973 and $6,902,070 worth was on hand at yearend. The inventory of feed grain on December 31, 1973, consisted of grain in the following amounts purchased at the following costs: Grain
Pounds
Cost
Corn
49,488,000
$ 2,430,880
Milo
87,440,000
4,048,028
Silage
28,676
423,162
Total
136,956,676
$ 6,902,070
In 1973, the partnership received *289 $49,571 from sales of feed grain. In 1974, it sold grain with a basis of $1,844,862 for $3,893,954, making a profit of $2,049,092. From January 1, 1974, to Agusut 31, 1974, $3,994,295 worth of the feed grain purchased in December 1973 was consumed. Of the December 1973 grain purchase, the partnership had $2,218,200 worth of milo and $172,892 worth of corn on hand on December 31, 1974. During the last calendar quarter of 1974, the partnership purchased $1,646,421 worth of corn, all of which was on hand at the end of that year. All of the grain purchased by the partnership during the taxable year 1973 was identifiable and in existence at the time of purchase. Its location was known and identified at the time of purchase. The partnership obtained immediate title to and possession of the grain through certified warehouse receipts which specifically identified the quantity and quality of grain purchased. Having paid for the grain, the partnership had no right to receive a refund of any portion of the purchase price or to substitute other goods or products for the feed ingredients specified in the warehouse receipts. The price of cattlefeed is usually lowest at harvest-time, generally *290 the middle to late fall of each year. In order to benefit by the low feed prices, the partnership sought to purchase grain as soon as possible after the fall 1973 harvest. Moreover, grain prices had fluctuated sharply during 1973. Due to such prevailing conditions as increased grain purchases by foreign governments, the Federal government's announced intention to abandon grain price supports, and the February 1973 devaluation of the dollar, the general partner expected that grain prices would continue to rise and that grain shortages might occur in the near future. By purchasing $7,363,887 of feed during its first short taxable year, the partnership intended to protect itself against sharp price increases and possible feed grain shortages during its first feeding cycle. In the cattlefeeding community of the Oklahoma-Texas panhandle, it was customary to purchase feed in advance of consumption. The partnership's 1973 grain purchases were consistent with that business practice. The managers of the general partner reasonably believed that the lowr fall prices would more than offset the interest expense and storage costs associated with the advanced purchase of feed components. *291 All of the December 1973 expenditures for feed were made for a business purpose and not solely for tax deferral or avoidance. A high level of investment in cattlefeeding partnerships during the early 1970's caused the number of cattle fed to increase dramatically, producing a glut of cattle on the market and a significant drop in the price of fattened cattle. Like many other cattle-feeders, the partnership sustained losses on sales of cattle in 1974 due to adverse economic conditions in the cattle market. To limit its losses, the partnership decreased the size of its planned operations and did not meet its original goal of feeding 32,000 head of cattle during the initial feeding cycle. On its 1973 income tax return, the partnership reported interest income of $4,446 and miscellaneous income of $483, and claimed a net farm loss of $7,512,370 or a net loss of $7,507,441. Most of the loss was attributable to the December 1973 purchase of $7,363,887 worth of feed grain. The deficiencies here in dispute are attributable to respondent's disallowance of the partnership's loss deduction to the extent of $6,478,908, an amount representing the total cost of corn and milo on hand on December 31, 1973. *292 Respondent agrees that the partnership had a good business reason for buying the grain when it did and that in making the purchase it was following the customary business practice of the Oklahoma-Texas panhandle area as well as the business judgmen0 of the general partner. Respondent maintains, however, that under section 446(b), [2] the partnership's 1973 loss must be disallowed to the extent of the total cost of the corn and milo on hand at the close of the year to prevent a material distortion of the partnership's income. [3] Petitioners contend that, as a farmer, which had elected the cash receipts and disbursements method of accounting, the partnership is entitled to deduct in 1973 the full amount of its actual outlay for feed for its cattle in that year. *293 We hold for petitioners. Our decision in this case is controlled by Van Raden v. Commissioner,71 T.C. 1083 (1979). The parties have stipulated tat the partnership was a "farmer" for Federal income tax purposes. Section 1.471-6(a), Income Tax Regs., provides that a farmer has an option to use the cash receipts and disbursements method or the inventory method of accounting. It is further stipulated that the partnership elected to use the cash receipts and disbursements accounting method. Under that method "amounts representing allowable deductions shall, as a general rule, be taken into account for the taxable year in which paid." Sec. 1.461-1(a)(1), Income Tax Regs.; United States v. Catto,384 U.S. 102, 106 (1966). [4] The cost of feed for cattle is an allowable deduction under section 1.162-12(a), Income Tax Regs., which provides specifically that: *294 The purchase of feed and other costs connected with raising livestock may be treated as expense deductions insofar as such costs represent actual outlay * * *. This unequivocal language of the regulations leads to the conclusion that the partnership is entitled to deduct in the years in issue the disputed feed expenses which were paid in that year. In Van Raden v. Commissioner,supra, the taxpayers, as limited partners, invested in a cash basis partnership cattlefeeding operation in mid-December 1972. During the last few days of 1972, the partnership purchased a one-year supply of feed and some cattle. The Commissioner disallowed the deduction for the feed expense on the grounds that there was no business purpose for the prepayment of feed expense and that the deduction of the cost of the feed caused a material distortion of income in the year of the purchase. In the light of all the evidence, this Court found that there was a business purpose for the feed purchase--a point conceded in the instant case. The Court rejected the argument that the purchases caused a material distortion of income, stating (71 T.C. at 1104): The cash method *295 of accounting will usually result in some distortion of income because the benefits derived from payments for expenses or materials extend to varying degrees into more than one annual accounting period. If the cash method is consistently utilized and no attempt is made to unreasonably prepay expenses or purchase supplies in advance, the distortion is not material and over a period of years the distortions will tend to cancel out each other. Respondent attempts to distinguish Van Raden on the ground that, in the instant case, a substantial portion of the grain purchased in December 1973 was in fact on hand for a period longer than one year. In Van Raden, in contrast, 98.31 percent of the corn and 91.11 percent of the silage was consumed during the next taxable year. But the Court in Van Raden did not base its conclusion on that ground. The Court looked not to the time period over which the grain was actually consumed but rather to the period over which the general partner expected at the time of purchase that it would be consumed. Here the partnership, in order to avoid the risks of higher feed prices and the anticipated problem of a short supply of feed, purchased *296 the feed as near after the fall harvest as possible. The partnership purchased only enough feed for one feeding cycle. The parties have stipulated that the partnership reasonably believed at the time of purchase that the grain bought in December 1973 would be consumed during the first half of the following taxable year. Several reasons, enumerated above, serve to explain the variance between that expectation and the situation which ultimately obtained. We know of no authority which authorizes the Commissioner to make his determination to exercise his power under section 446(b) on the basis of events which were not anticipated or expected by the taxpayer at the end of his taxable year. "Deductibility does not depend on ability to foretell weather conditions," Cravens v. Commissioner,272 F.2d 895, 899, fn. 13 (10th Cir. 1959), revg. on other grounds 30 T.C. 903 (1958), or the adverse economic conditions, described above, which caused the partnership to decrease the size of its planned operations. Respondent's principal argument appears to be that the December *297 1973 feed purchases were capital expenditures which gave the partnership a capital asset the deduction for which, under the principles of section 263, Commissioner v. Idaho Power Co.,418 U.S. 1, 16 (1974) and Commissioner v. Lincoln Savings and Loan Ass'n,403 U.S. 345, 358 (1971), [5] must be prorated over the period during which the feed is used. Section 1.461-1(a)(1), Income Tax Regs., the argument goes, provides that "[if] an expenditure results in the creation of an asset having a useful life which extends substantially beyond the close of the taxable year," such an expenditure may not be deductible, or may be deductible only in part, for the taxable year in which made. [6] Relying upon section 446(b), which gives the Commissioner discretionary power to require a recomputation of income if the method used by the taxpayer does not clearly reflect income, respondent argues that allowing a deduction for the full amount of the grain purchased in December 1973 distorts petitioner's income. [7] Cf. Clement v. United States,580 F.2d 422, 428 (Ct. Cl. 1978), cert. denied 440 U.S.    *298 (Feb. 21, 1979); Dunn v. United States,     F.Supp.     ( S.D. N.Y., Mar. 12, 1979, 79-1 USTC par. 9295,     AFTR 2d    ). *299 This Court rejected that argument in Van Raden, and we reject to here. The distortion in the partnership's 1973 income is not attributable to the failure to feed all the purchased grain in that year. It is due to the partnership's failure to sell cattle so that income would be available to match the cost of the purchases. The same distortion would have occurred if the partnership had fed all the grain in 1973 and sold none of its cattle. Distrortions of this character can be prevented only by requiring farmers to employ a method of accounting which requires a matching of income with expenses. Yet the regulations cited above expressly permit farmers to use the cash method of accounting. The language quoted above from section 1.461-1(a)(1), Income Tax Regs., regarding assets having a "useful life" beyond the taxable year, deals with so-called "period costs" which constitute capital expenditures or result in the acquisition of a capital asset. Such costs must be prorated. The regulation refers to the proration of such costs through deprecitation, depletion, and losses under sections 167, 611, and 165, respectively. See, e.g., University Properties, Inc. v. Commissioner,45 T.C. 416 (1966), *300 affd. 378 F.2d 83 (9th Cir. 1967) (perpaid rent); Commissioner v. Boylston Market Ass'n,131 F.2d 966 (1st Cir. 1942), affg. a Memorandum Opinion of this Court (prepaid insurance). This type of cost as explained in Van Raden arises "with respect to time intervals" or as "an inherently declining value * * * [affected by] the passage of time" or is "inherently keyed to more than one taxable period." The issue here presented does not involve a capital expenditure or the acquisition of a capital asset. Rather the issue is only with respect to the costs of purchashing feed for livestock which, under section 1.162-12(a), Income Tax Regs., may be treated as expense deductions insofar as they represent actual outlay. Cattlefeed is not an asset having a "useful life" which extends substantially beyond the close of the taxable year within the meaning of the quoted language from section 1.461-1(a)(1), Income Tax Regs. The term "useful life" refers to an asset which is gradually exhausted through use or the *301 passage of time. Cattlefeed does not deteriorate with the passage of time or become exhausted through use over an extended period. It is merely an inventory item which is consumed in the production of cattle for slaughter, and the inventory is reduced in a taxable period by the amount fed to cattle during that period. It is part of the cost of goods--the cattle--ultimately sold. [8]
*302 True, in any one given period, particularly the first period in which a farming venture is operated, the cash method of accounting may not produce the exactness in the computation of taxable income which the inventory method would produce, but acceptance of respondent's argument in the instant case would deny the choice of the method of accounting which has been extended to farmers by the Income Tax Regulations. This point was explained by the Supreme Court in United States v. Catto,384 U.S. 102, 116 (1966), as follows: The sacrifice in accounting accuracy under the cash method represents an historical concession by the Secretary and the Commissioner to provide a unitary and expedient bookkeeping system for farmers and ranchers in need of a simplified accounting procedure. Over a period of time the cash method of accounting will produce a fair and equitable result. The "distortion" in one year will be offset by a "distortion" in another year with the result that over a period of time tax taxpayer's income will be clearly reflected. Respondent contends that the *303 legislative history of section 464, enacted as section 207, Tax Reform Act of 1976, P.L. 94-455, 90 Stat. 1520, indicates that Congress believed that Rev. Rul. 75-152 represented the then existing law. In Van Raden v. Commissioner,supra, we found nothing in the tax history of that act relevant to the taxable year at issue, 1972. We think the same conclusion is equally applicable in respect of the taxable year 1973. To reflect the foregoing, Decisions will be entered for the petitioners. Footnotes
1. The following cases are consolidated herewith: Richard A. Colven and Jane B. Colven, dkt. No. 6944-77; William B. Gilmore and Doris J. Gilmore, dkt. No. 7623-77; and Wallace C. Reed and Ann B. Reed, dkt. No. 7635-77.↩
2. All section references are to the Internal Revenue Code of 1954, as in effect during the tax year in issue, unless otherwise noted. Sec. 446(b) provides as follows: SEC. 446.GENERAL RULE FOR METHODS OF ACCOUNTING. (b) Exceptions.--If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary or his delegate, does clearly reflect income. ↩
3. Respondent's position is based on Rev. Rul. 75-152, 1975-1 C.B. 144↩, which sets out the following tree-part test for determining whether the cost of feed to be consumed in a following year may be deducted in the year of payment: (1) The expenditure for feed must be a payment, not merely a deposit; (2) the prepayment must be for a business purpose, not merely for tax avoidance; and (3) the deduction of such costs in the taxable year must not result in a material distortion of income. Respondent concedes that the first two parts of the test have been met in the instant case and relies solely on the material distortion of income argument. This revenue ruling has not been embodied in the Income Tax Regulations. It is merely a statement of the Commissioner's litigation and administrative position.
4. In United States v. Catto,384 U.S. 102, 106 (1966), the Court said: The applicable Treasury Regulations grant a current deduction for the expenses incurred in raising livestock, without regard either for the purpose for which the animals are raised or for the method of accounting employed by the taxpayer. For ranchers who have elected the cash method of accounting, the current deduction is of course taken against ordinary income in the year the expense is paid. [Fn. ref. omitted.]↩
5. Neither Commissioner v. Idaho Power Co.,418 U.S. 1 (1974) (construction related depreciation treated as part of the cost of acquiring a capital asset) nor Commissioner v. Lincoln Savings and Loan Ass'n,403 U.S. 345, 358 (1971) (a premium payment made by a savings and loan association under compulsion of the National Housing Act treated as a capital expenditure) involves the special rules authorizing farmers to use the cash method of accounting. In other contexts the Commissioner has maintained that the cost of feed for livestock may not be capitalized by cash basis farmers but must be currently deducted. See, e.g., Sonnabend v. Commissioner,377 F.2d 42, 43-44 (1st Cir. 1967), revg. and remg. 46 T.C. 382 (1966); Welder v. United States,329 F.Supp. 739 (S.D. Tex. 1971), affd. per curiam 461 F.2d 1269↩ (5th Cir. 1972). 6. Sec. 1.461-1 General rule for taxable year of deduction. (a) General rule--(1) Taxpayer using cash receipts and disbursements method↩. Under the cash receipts and disbursements method of accounting, amounts representing allowable deductions shall, as a general rule, be taken into account for the taxable year in which paid. Further, a taxpayer using this method may also be entitled to certain deductions in the computation of taxable income which do not involve cash disbursements during the taxable year, such as the deductions for depreciation, depletion, and losses under sections 167, 611, and 165, respectively. If an expenditure results in the creation of an asset having a useful life which extends substantially beyond the close of the taxable year, such an expenditure may not be deductible, or may be deductible only in part, for the taxable year in which made. An example is an expenditure for the construction of improvements by the lessee on leased property where the estimated life of the improvements is in excess of the remaining period of the lease. In such a case, in lieu of the allowance for depreciation provided by section 167, the basis shall be amortized ratably over the remaining period of the lease. See section 178 and the regulations thereunder for rules governing the effect to be given renewal options in determining whether the useful life of the improvements exceeds the remaining term of the lease where a lessee begins improvements on leased property after July 28, 1958, other than improvements which on such date and at all times thereafter, the lessee was under a binding legal obligation to make. See section 263 and the regulations thereunder for rules relating to capital expenditures.
7. In Van Raden v. Commissioner,71 T.C. 1083 (1979), the Court rejected the taxpayer's argument that the discretionary power described in sec. 446(b) is not available to the Commissioner when dealing with farmers who use the cash method of accounting. Petitioner in the instant case has made the same argument, and we adhere to the views expressed in Van Raden. See also Sandor v. Commissioner,62 T.C. 469 (1974), affd. per curiam 536 F.2d 874↩ (9th Cir. 1976).
8. In Cravens v. Commissioner,272 F.2d 895, 899 (10th Cir. 1959), revg. the finding in 30 T.C. 903 (1958), stating that an advance payment for feed was a deposit, the court dealt with the "material disfortion" argument as follows: The Commissioner suggests that as the benefit of the $50,000 disbursement extended beyond the tax year it constituted a capital investment. While it is not easy to draw the line between capital investments and current expenses, this payment was not for an addition, a betterment, or an advantage of a permanent character but for the day by day supply of food without which the herd could not survive.The fact that the expenditure covered feed for more than a twelve-month period does not convert it into a capital expenditure, especially where, as here, the length of the drought was uncertain and the deterioration of pasture conditions required a sale of more than 75% of the herd. [Fn. refs. omitted.] The stipulated facts in the instant case to the effect that the partnership anticipated a shortgage of feed as well as higher prices bring it within the Cravens↩ reasoning.